## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## ST. THOMAS/ST. JOHN DIVISION

| | | |
|---|---|---|
| TOM CARIVEAU | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 3:24-29 |
| | : | |
| DR. LINDA CALLWOOD, WELMA | : | |
| FREEMAN-WALTER, WYNNIE | : | |
| TESTAMARK, ISHMAEL SMITTIE, | : | |
| ALBERT BRYAN, JR., JOHN DO EI, | : | |
| JOHN DOE 2, ACCREDO HEALTH | : | |
| INCORPORATED, ACCREDO | : | |
| HEALTH GROUP, INC., EXPRESS | : | |
| SCRIPTS, INC., JOHN DOE 3, JOHN | : | |
| DOE 4, JOHN DOE 5 | : | |

## MEMORANDUM

**KEARNEY, J.**                                                        **January 31, 2025**

Craig Vanausdal traveled to St. Thomas for business in May 2022. Customs officials arrested him at the St. Thomas airport before Mr. Vanausdal could leave based on an outstanding Pennsylvania warrant related to a marijuana charge from eighteen years earlier. The Virgin Islands authorities placed Mr. Vanausdal in the St. Thomas Jail. Mr. Vanausdal told the authorities he suffered from hemophilia A and required his specialized medication. The medical staff at the St. Thomas Jail discarded expired medication Mr. Vanausdal had with him and then spent several days trying to obtain this specialized medication on the island or from Mr. Vanausdal's specialty pharmacy in California, or to arrange for Mr. Vanausdal's transfer to a facility off the island. A mainland pharmacy company did not immediately fill the prescription order and deliver it to St. Thomas. The medical professionals never obtained the medicine and the correctional officers never transferred Mr. Vanausdal off island. They did not take him to the hospital despite his apparently worsening symptoms due to lack of staffing.

Mr. Vanausdal tragically died from complications from his hemophilia after twelve days in custody at the St. Thomas Jail. His estate's personal representative now sues several of the Jail's medical professionals and corrections officers, the Jail Warden, the Director of the Virgin Islands Bureau of Corrections, and the Governor of the Virgin Islands. He also sues the specialty pharmacy responsible for filling Mr. Vanausdal's prescriptions, its corporate parent, and several fictitious affiliated entities or employees for not shipping the medication to the St. Thomas Jail as soon as the personal representative thinks they should have.

Something very tragic happened here putting aside sections of the first amended Complaint drafted like a press release rather than a short and plain claim for relief required by Rule 8. Counsel are forewarned about conclusory hyperbole; it detracts from their advocacy. We focus on facts as pleaded and later developed in tailored discovery.  We will strike speeches and posturing.

The personal representative pleads negligence claims against the specialty pharmacy parties and pleads claims for deliberate indifference against the moving members of the Jail staff under the Eighth Amendment for discarding Mr. Vanausdal's expired medication, not taking him to the hospital, and not calling for medical assistance as he became unresponsive in his cell. But he does not identify the specific conduct of the Director or the Governor resulting in harm to Mr. Vanausdal. And the personal representative's survival claim is plainly untimely on the face of the first amended Complaint.

We deny the specialty pharmacy parties' Motion to dismiss. We grant in part and deny in part the state actors' Motion to dismiss. Discovery into the remaining claims and narrowed arguments compliant with our Policies will assist meeting our collective obligations under Federal Rule 1.

## I.    Alleged Facts

Californian Craig Vanausdal worked in the United States Virgin Islands in early May 2022.[1] He planned to return to the mainland on a flight departing from the Cyril E. King Airport in St. Thomas on May 4, 2022.[2] Agents of the United States Customs Office and/or the Virgin Islands Police Department arrested him at the Airport, suspecting Mr. Vanausdal had an outstanding warrant from an alleged 2004 marijuana arrest in Pennsylvania.[3] Unidentified persons brought Mr. Vanausdal to the St. Thomas Jail as a pretrial detainee the same day.[4]

Mr. Vanausdal told state actors during his intake he had hemophilia A—the most common X-linked genetic disease associated with severe bleeding manifestations.[5] He told the state actors he must take prophylaxis medication or he could die.[6] He advised the state actors how often he took the medication and when he last took it—May 2, 2022.[7] He did not have excess medication with him other than expired doses because he was traveling home and intended to take his medication upon arrival.[8] Mr. Vanausdal signed a medical authorization for the facility to access his medical information.[9] Unidentified state actors photographed Mr. Vanausdal's prescription medication with the labels attached on May 8, 2022.[10] The St. Thomas Jail doctor, Dr. Linda Callwood, interviewed Mr. Vanausdal on May 9, 2022.[11] She noted his hemophilia and Monday/Wednesday/Friday dosing of medication.[12] Dr. Callwood decided to discard the additional doses of medication Mr. Vanausdal had with him as they were expired.[13]

### Oversight of Virgin Islands correctional facilities after 2013.

The Government of the Virgin Islands, the Virgin Islands Bureau of Corrections, and the American Civil Liberties Union entered into a settlement agreement in 2013 requiring correctional facilities to provide detained individuals with timely access to adequate medical and mental health care for chronic and acute conditions.[14] The settlement agreement requires the Virgin Islands

Bureau of Corrections to retain a physician board-certified in internal medicine, family medicine, or emergency medicine for at least two hours each day to conduct intake screenings, physical exams, sick calls, and medical assessments.[15] A physician must be on call during the times a physician is not physically present at the facility.[16] The Virgin Islands Bureau of Corrections had not, as of the time of Mr. Vanausdal's detention at the St. Thomas Jail, met the conditions of the settlement agreement due to budget constraints.[17]

### *Responses to Mr. Vanausdal's deteriorating health.*

Mr. Vanausdal complained of right ankle pain on May 9, 2022 as a result of not getting his medicine.[18] Registered Nurse Welma Freeman-Walter also noted Mr. Vanausdal's swollen, painful ankle on an unpleaded date.[19] Dr. Callwood spoke to Mr. Vanausdal's girlfriend, Taylor Hayes, on May 9, 2022 to find out the name of his medical provider at home.[20] Dr. Callwood then spoke with Mr. Vanausdal's treating physician in California who advised her Mr. Vanausdal had a prescription for Recombinant 3000 units to be infused daily by slow injection after being mixed with sterile water.[21] Dr. Callwood called the local pharmacy the same day only to learn this medication could only be obtained from a specialty pharmacy.[22]

Dr. Callwood then contacted Accredo Specialty Pharmacy, who provided Mr. Vanausdal's hemophilia medication.[23] An unidentified person affiliated with Accredo told Dr. Callwood the pharmacy mailed a twelve-dose prescription to Mr. Vanausdal's home address in California on May 3, 2022 (the day before agents picked him up at the airport), so they would not send the lifesaving medication to St. Thomas.[24] Mr. Vanausdal's girlfriend, Ms. Hayes, also called Accredo and told them Mr. Vanausdal urgently needed his hemophilia medication to be shipped overnight to St. Thomas.[25] Accredo did not ship the hemophilia medication as requested.[26] Dr. Callwood called Ms. Hayes again on May 9, 2022 and told her to overnight the medication.[27] Dr. Callwood

did not offer to pay the $500 expense for the shipping but the Virgin Islands Bureau of Corrections agreed to pay for the customs fee.[28] Personal Representative Cariveau does not allege whether Ms. Hayes knew it would cost $500 to ship the medication at the time of this call or if she learned the cost later.

Mr. Vanausdal continued to suffer symptoms related to his hemophilia in the Jail. Mr. Vanausdal put in a sick call request on May 10, 2022 describing his difficulty sleeping, pain, and a reported bleed starting in his right elbow.[29] The following day, May 11, Mr. Vanausdal complained of right elbow pain and Nurse Freeman-Walter assessed him.[30] Dr. Callwood and Nurse Freeman-Walter completed a consultation form the same day to have Mr. Vanausdal examined at Caribbean Hematology and Oncology Center.[31] But Mr. Vanausdal could not attend the appointment due to understaffing at the Jail because corrections staff took another incarcerated person to an appointment.[32] But Dr. Callwood spoke to hematologist Dr. Bachan at the Caribbean Oncology Center who advised her she could not obtain the necessary medication on island.[33]

Dr. Callwood called the Pennsylvania Sheriff Department the next day, May 12, seeking an immediate transfer of Mr. Vanausdal to Pennsylvania due to her inability to treat his hemophilia on the island.[34] Someone from Accredo told Dr. Callwood later the same day Mr. Vanausdal's girlfriend, Ms. Hayes, had called the pharmacy and explained she could not ship the medication due to costs.[35] Dr. Callwood told the person from Accredo to invoice her for the cost of direct mailing from the pharmacy.[36] The next day, May 13, someone from Accredo told Nurse Freeman-Walter of its decision to ship the life-critical medication by FedEx.[37] Dr. Callwood also learned on Friday, May 13 a judge would not be able to hear Mr. Vanausdal's case until Monday, May 16.[38]

*The state actors' final-days responses to a fatally ill person in custody.*

Mr. Vanausdal developed an elevated heart rate known as "tachycardia"—a systemic sign of hemorrhage—on Saturday, May 14. Mr. Vanausdal complained the same day of increased pain and bleeding into his elbow with new bruises.[39] He reported having too much pain to walk.[40] Mr. Vanausdal also exhibited organ system signs of hemorrhage on May 14 including musculoskeletal and gastrointestinal issues, hematomas, and bleeding at various sites all over his body.[41] By Sunday, May 15, Mr. Vanausdal could only walk to the door with crutches.[42] Despite the outward symptoms Mr. Vanausdal displayed during his detention, medical and corrections staff never took him to the hospital or arranged for a life flight off the island.[43]

An unidentified person contacted the Virgin Islands Emergency Medical Services on Monday, May 16 at 3:58 AM.[44] Corrections officers visited with Mr. Vanausdal thirty minutes before the arrival of Emergency Medical Services.[45] The corrections officers described Mr. Vanausdal as conscious and alert initially, but he slowly became unresponsive during the thirty minutes.[46] Neither officer contacted medical personnel.[47] One of the officers briefly performed CPR at an unpleaded time, then stopped, leaving Mr. Vanausdal without CPR until Emergency Medical Services arrived. Emergency Medical Services arrived at the Jail at 4:17 A.M. and found Mr. Vanausdal shirtless on the floor, unresponsive to stimulus, apneic, pulseless, and cold to the touch.[48]

Emergency Medical Services pronounced Mr. Vanausdal dead early on Monday morning, May 16, in the St. Thomas Jail.[49]

## II.    Analysis

Mr. Vanausdal's personal representative Tom Cariveau sued Dr. Callwood, Nurse Freeman-Walter, Wynnie Testamark (the Director of the Virgin Islands Bureau of Corrections), Ishmael Smittie (the Warden at the Criminal Justice Complex of St. Thomas), Governor Albert Bryan, Jr., and two John Doe corrections officers, all in their individual capacities, on May 4, 2024, asserting various Fourteenth Amendment deliberate indifference claims and a survival claim under Virgin Islands law.[50]

Personal Representative Cariveau filed an amended Complaint and added Accredo Health Incorporated, Accredo Health Group, Inc., Express Scripts, Inc., and three additional John Does: John Doe 3, the corporation or entity that handled the distribution of Mr. Vanausdal's medication, John Doe 4, the corporation or entity that communicated with authorities in the Virgin Islands or other individuals concerning Mr. Vanausdal's medication, and John Doe 5, an individual who worked for one of the Accredo parties and did not ship Mr. Vanausdal's medication to the Virgin Islands as requested.[51] Personal Representative Cariveau asserted claims for negligence and gross negligence against the new parties and added the new parties to the existing survival claim.[52]

Accredo Health Incorporated, Accredo Health Group, Inc., and Express Scripts, Inc. moved to dismiss the amended Complaint, arguing Personal Representative Cariveau did not exhaust his claims under the Virgin Islands Medical Malpractice Act.[53] Dr. Callwood, Nurse Freeman-Walter, Director Wynnie Testamark, Governor Bryan, and the corrections officers separately moved to dismiss, arguing they did not violate Mr. Vanausdal's constitutional rights, they are entitled to qualified immunity, and Personal Representative Cariveau did not exhaust his non-constitutional tort claims under the Virgin Islands Medical Malpractice Act.[54] The Chief Judge reassigned this

matter to us earlier this month. We studied the allegations and governing law. We deny Accredo's Motion to dismiss and grant in part and deny in part the state actors' Motion to dismiss.[55]

### A.  We deny Accredo's Motion to dismiss.

Accredo argues Personal Representative Cariveau's negligence claims are subject to the Virgin Islands Medical Malpractice Act.[56] The Legislature of the Virgin Islands requires individuals to file a complaint with the Medical Malpractice Review Committee at least ninety days before suing a health care provider.[57] Personal Representative Cariveau does not allege he complied with the Act's pre-filing requirements, which Accredo claims divests us of subject matter jurisdiction over the case.[58] Accredo argues it is a "health care provider" under the Act and Personal Representative Cariveau's claims are essentially medical malpractice claims because they are tort claims rooted in health care or medical services.[59] Accredo does not challenge the differing roles of the three separately named companies. Personal Representative Cariveau responds Accredo is not a health care provider under the Act and the Act does not apply anyway because the claims against Accredo sound in ordinary negligence, not medical malpractice.[60] We deny Accredo's Motion to dismiss finding Accredo is not a health care provider and the claims against Accredo are not medical malpractice claims but claims for ordinary negligence.[61]

#### 1.  Accredo pharmacy is not a health care provider under the pleaded facts requiring Personal Representative Cariveau to exhaust administrative remedies before suing.

Accredo is not a health care provider under the Act. The Legislature defines a "health care provider" as "a person, corporation, facility or institution who must be licensed by this territory to provide health care or professional medical services including a medical, osteopathic, chiropractic or naturopathic physician, hospital, dentist, registered or licensed practical nurse to include the

Advanced Practice Registered Nurse, optometrist, podiatrist, physical therapist, psychologist, paramedical personnel, emergency medical technician, pharmacist and laboratory technician."[62]

Accredo argues it is a health care provider because Personal Representative Cariveau describes the Accredo parties in his pleadings as specialty pharmacies licensed to sell, dispense, and ship prescription medication.[63] Accredo assumes it falls under the definition of "health care provider" because it is a pharmacy.[64] Personal Representative Cariveau responds Accredo is not a health care provider because the Legislature includes the word "pharmacist" but not the word "pharmacy technician," and a pharmacy technician—not a pharmacist— is responsible for refusing to ship Mr. Vanausdal's medicine.[65] Personal Representative Cariveau also argues the Act only pertains to health care providers "licensed by this territory to provide health care or professional medical services[,]" and discovery might reveal Accredo is not, in fact, licensed.[66] If Accredo is licensed it would "be screaming it from the rooftops" instead of relying on the general averment in the amended Complaint pleading Accredo is licensed based on "information and belief."[67] Accredo replies the plain terms of the amended Complaint allege Accredo is a health care provider and Personal Representative Cariveau sued the Accredo parties as corporate entities so his reliance on the absence of the phrase "pharmacy technician" in the Act is inconsequential.[68]

We agree with Accredo the attempt to distinguish between a "pharmacist" and a "pharmacy technician" is not persuasive given Personal Representative Cariveau sues the Accredo parties in their corporate capacities and does not name a pharmacy technician as a defendant. The Legislature undoubtedly intended the Act applies to ***pharmacists***. But we still must decide whether the Act applies to Accredo, an entity.

Judge Bartle's opinion in *Walcott v. Doctor's Choice Medical, Inc.* is instructive.[69] Judge Bartle found the Act encompasses "providers of health care or professional medical services

9

specifically identified in the Act whether or not the providers are specifically required to be licensed, and all others who must be specifically licensed to provide health care or professional medical services whether or not they are enumerated in the Act."[70] Judge Bartle concluded orthotic fitters are not health care providers because they are not identified in the Act and they are not required to have a license to provide health care or professional medical services.[71]

Judge Bartle's analysis persuades us the Act only applies to Accredo if it is a type of provider specifically identified in the Act or if it has a license to provide health care or professional medical services. "Title 27 of the Virgin Islands Codes . . . governs professional licensure requirements."[72] "Chapter 1 of Title 27 concerns the health professions and is also the chapter where the Malpractice Act is found."[73]

We look to the Legislature's definitions for guidance. A "pharmacist" is "a person duly licensed by the Board of Pharmacy to engage in the practice of pharmacy."[74] A pharmacy is "a place licensed by the Government of the Virgin Islands with the approval of the Board, where drugs, chemicals, medicines, prescriptions and poisons are compounded, dispensed or sold at retail and immunizations recommended and administered and appropriate tests ordered, conducted and interpreted."[75] And the "practice of pharmacy" is the "profession concerned with the art and science of preparing, compounding and dispensing of drugs and devices, whether dispensed on the prescription of a medical practitioner or legally dispensed or sold directly to the ultimate consumer, and shall include the proper and safe storage and distribution of drugs, the maintenance of proper records therefor, and the responsibility of relating information as required concerning such drugs and medicines and their therapeutic values and uses in the treatment and prevention of disease . . . ."[76] We cannot agree Accredo, a specialty pharmacy with no brick-and-mortar facility in the Virgin Islands, necessarily qualifies as a "pharmacist" under the Act; Personal Representative Cariveau

10

does not allege Accredo performs all of the pharmacological functions contemplated by section 41 such as maintaining records and relating information about drugs.

Assuming Accredo is not a pharmacist, the only other way the Act applies to Accredo is if Accredo has a license to provide health care or professional medical services. Personal Representative Cariveau pleads the Accredo parties "received a license from the applicable Government agency to sell and deliver medicine to customer [sic] in the Territory of the Virgin Islands."[77] He argues in his response this is not necessarily the same as a license to provide health care or professional services.[78] He also suggests if Accredo is licensed it would "be screaming it from the rooftops" instead of relying on his "information and belief" averment to show it is not licensed.[79] We do not agree with this second point: Personal Representative Cariveau is the master of his Complaint and Accredo is simply responding to his pleadings; it has no obligation to adduce evidence at this stage. Yet, we agree with Personal Representative Cariveau's ultimate point: the licensing issue is better handled at summary judgment. The Accredo pharmacies are allegedly licensed "to sell and deliver medicine" to people in the Virgin Islands; the Act applies to people and corporations licensed "to provide health care or professional medical services."[80] It is not clear from the face of the pleadings a license to sell medicine is the same as a license to provide health care or professional medical services. So, we cannot conclude based on the pleadings we lack subject matter jurisdiction. Discovery might prove Accredo does not have a license subjecting it to the Act.

### 2. The claims against Accredo are ordinary negligence claims, not claims for medical malpractice subject to the Act.

Personal Representative Cariveau's claims against Accredo sound in ordinary negligence, not medical malpractice. The import of this finding is the Act does not apply even if Accredo could prove its licensing makes it a health care provider. "The purpose of the Malpractice Act is to limit

the liability of health care providers for claims sounding in malpractice."[81] "Malpractice" is "any tort or breach of contract based on health care or professional services rendered, or which should have been rendered by a health care provider, to a patient."[82] "Health care" is "any act, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment or confinement."[83]

Accredo argues Personal Representative Cariveau's claims against it are medical malpractice claims disguised as negligence claims.[84] The claims fall within the scope of the Act because they are based on "health care or professional medical/prescription services that [Personal Representative Cariveau] claims should have been rendered to Decedent by the Accredo Defendants . . . ."[85] Accredo argues its alleged failure to timely dispense Mr. Vanausdal's medicine "requires specialized knowledge to determine if the standard of care [was] breached."[86] Personal Representative Cariveau responds his claims are not medical malpractice claims because they arise from Accredo's decision not to ship an already-prescribed medicine to Mr. Vanausdal, which is different than a pharmacy prescribing the wrong medicine or failing to advise a patient of a medicine's side effects.[87] Accredo replies the claims are for medical malpractice because they hinge on whether Accredo knew its failure to ship the medicine could result in injury or death, which a layperson cannot determine.[88] Accredo cites to *Brown v. Express Scripts Holding Co., et al.*, where Judge Kallon concluded the plaintiff did not prove the pharmacy breached the standard of care applicable to Alabama pharmacies by failing to fill the plaintiff's medicine on time.[89]

We study decisions of our colleagues for guidance. Judge Donohue's analysis in *Ference v. Virgin Islands Family Sports & Fitness Center, Inc.* provides helpful guidance on distinguishing ordinary negligence from malpractice under the Act.[90] Judge Donohue considered as a matter of

first impression in *Ference* whether a claim against a rehabilitation center constituted malpractice subject to the Act or ordinary negligence.[91] He explained this determination should be made on a case-by-case basis but factors to consider include "whether the injury occurred during the patient's care, treatment, supervision, or lack thereof" and "whether determination of the wrong can be made based on everyday experience or knowledge, or whether the claim requires professional expert testimony to assist a fact finder in making that determination."[92] "Most courts that have refused to find such claims subject to the statute have done so only if the negligence of the act could be determined by common or everyday knowledge, or where the alleged wrong did not arise from medical treatment."[93]

Our decision hinges on whether Accredo's alleged failure to send Mr. Vanausdal his medicine means Accredo failed to care for, treat, or supervise him. Accredo describes the situation as a failure to render health care, which requires specialized knowledge; Personal Representative Cariveau describes the situation as a mere logistical decision not to make a shipment. We are more persuaded by Personal Representative Cariveau's argument. He pleads the claim and is bound by his judicial admissions. Accredo allegedly stated during a May 9, 2022 phone call it had already sent the medicine to Mr. Vanausdal's home address six days prior so it would not send a refill to St. Thomas. Personal Representative Cariveau identifies this decision as a "clerical" or "administrative" decision—one probably tied to insurance complications—than a decision not to render medical treatment. It is not as though Accredo outright refused to give Mr. Vanausdal his medicine; Personal Representative Cariveau does not claim Accredo made decisions about Mr. Vanausdal's treatment, his need for the medication, or the dosage. The claim is that a person from Accredo decided not to immediately ship the prescription because it had filled the script the week

before. We find, based on the nature of the alleged conduct, the claims are rooted in ordinary negligence rather than medical malpractice.

We acknowledge Judge Kallon's decision in *Brown v. Express Scripts* lends some support to Accredo's position expert testimony is needed to establish a pharmacy's standard of care and breach, but *Brown* is distinguishable.[94] There, no one disputed the plaintiff's claim was subject to Alabama's Medical Liability Act, so Judge Kallon did not need to decide whether the claim was actually rooted in medical malpractice versus ordinary negligence. And Judge Kallon concluded the plaintiff did not meet his burden to establish breach by presenting expert testimony at summary judgment, not on a motion to dismiss.[95] We will do the same and wait until summary judgment to decide whether Personal Representative Cariveau meets his burden.

Finding the claims against Accredo may proceed to discovery, we need not address Personal Representative Cariveau's other arguments concerning jurisdictional discovery and leave to amend. We also need not address Accredo's argument we should not grant leave to amend given our finding the claims against Accredo survive the Motion to dismiss.[96]

### B. We grant in part and deny in part the state actors' Motion to dismiss.

Dr. Callwood, Nurse Freeman-Walter, and the two John Doe corrections officers argue they were not deliberately indifferent in their care of Mr. Vanausdal during his extended custody in the St. Thomas Jail.[97] Director Testamark and Governor Bryan argue they had no personal involvement in Mr. Vanausdal's care.[98] All of the state actors claim they are entitled to qualified immunity.[99] The state actors also argue the Virgin Islands Medical Malpractice Act is implicated even though Personal Representative Cariveau does not assert a non-constitutional tort claim against the state actors, Personal Representative Cariveau has not plausibly alleged wrongful death and non-constitutional tort claims against Director Testamark and Governor Bryan, and Director

14

Testamark and Governor Bryan have qualified and common law immunity with respect to any non-constitutional tort claims.[100] The state actors lastly argue Personal Representative Cariveau's survival claim is time-barred because the two-year statute of limitations for survival claims shrinks to one year if the injured person dies before the two-year mark.[101]

Personal Representative Cariveau responds Dr. Callwood, Nurse Freeman-Walter, and the two John Doe corrections officers were deliberately indifferent, Director Testamark and Governor Bryan were personally aware of Mr. Vanausdal's condition, and the state actors are not entitled to qualified immunity because Mr. Vanausdal's right to life-saving medicine and treatment was clearly established.[102] Personal Representative Cariveau clarifies he is not bringing a state law or non-constitutional claims against the state actors.[103] He argues his survival claim is not time-barred because the case the state actors rely on is inapplicable and survival actions have a two-year statute of limitations.[104]

We grant in part and deny in part the state actors' Motion to dismiss finding Personal Representative Cariveau plausibly alleges deliberate indifference as to Dr. Callwood, Nurse Freeman-Walker, and the corrections officers (and they are not entitled to qualified immunity), but the claims against Director Testamark and Governor Bryan fail for lack of personal involvement and the survival claim is untimely. We need not address state actors' arguments concerning the non-constitutional tort claims (other than the survival claim) because Personal Representative Cariveau repeatedly confirms in his response he is not suing the state actors under state law.

> **1. Personal Representative Cariveau plausibly alleges deliberate indifference as to Dr. Callwood, Nurse Freeman-Walter, and the two John Doe corrections officers.**

Personal Representative Cariveau plausibly alleges deliberate indifference as to the medical staff and corrections officers at the St. Thomas Jail. "[T]he Supreme Court has concluded

that the Fourteenth Amendment affords pretrial detainees protections 'at least as great as the Eighth Amendment protections available to a convicted prisoner[.]'"[105] So, we analyze pretrial detainees' claims of inadequate medical care under the Fourteenth Amendment using the same standard we apply to incarcerated persons' claims under the Eighth Amendment.[106] "The Eighth Amendment 'prohibits any punishment which violates civilized standards and concepts of humanity and decency.'"[107] "The Supreme Court has interpreted this prohibition as 'impos[ing] affirmative duties on prison officials "to provide humane conditions of confinement."'"[108] "[W]hen the government takes a person into custody against his or her will, it assumes responsibility for satisfying basic human needs such as food, clothing, shelter, medical care, and reasonable safety."[109] "To state a Fourteenth Amendment claim based on the failure to provide medical care, a pretrial detainee must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs."[110] "Deliberate indifference is a subjective standard consistent with recklessness."[111] "It requires both that an individual be aware of facts from which the inference could be drawn of a substantial risk and that the individual actually draws that inference."[112] "In situations involving claims for inadequate medical care," our Court of Appeals has "found deliberate indifference . . . where there was 'objective evidence that [a] plaintiff had serious need for medical care,' and prison officials ignored that evidence."[113] Our Court of Appeals has also "found deliberate indifference in situations where 'necessary medical treatment is delayed for non-medical reasons.'"[114]

Incarcerated persons pleading state actors violated their civil rights must allege each actor's personal involvement in the complained of conduct.[115] The incarcerated person may not rely solely on a *respondeat superior* theory of liability."[116] "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."[117] "Allegations of

participation or actual knowledge and acquiescence . . . must be made with appropriate particularity."[118] "Alternatively, a plaintiff seeking to show personal involvement for a supervisor may plead facts which show that the alleged constitutional violation is the result of a policy, practice, or custom put into effect by the supervisor."[119] "[T]o hold a supervisor liable because his policies or practices led to an Eighth Amendment violation, the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice."[120]

The state actors do not argue Dr. Callwood, Nurse Freeman-Walker, and the corrections officers were not personally involved with the situation involving Mr. Vanausdal. Nor do they dispute Mr. Vanausdal had a serious medical need. They draw a distinction between a complete denial of care and inadequate care, and argue mere medical malpractice is not a constitutional violation under *Estelle v. Gamble*.[121] They claim Dr. Callwood was not deliberately indifferent because she examined Mr. Vanausdal shortly after officials took him into custody and contacted Mr. Vanausdal's girlfriend, his treating physician, a local pharmacy, and the Accredo pharmacy to try to obtain his medicine.[122] She also contacted a Virgin Islands hematologist and a Pennsylvania sheriff about the situation.[123]

According to the state actors, the state actors properly decided as a matter of medical judgment to throw out Mr. Vanausdal's expired medicine and not take him to the hospital. Dr. Callwood and/or Nurse Freeman-Walker threw out the medicine because giving someone expired medicine might constitute "medical negligence."[124] Dr. Callwood and/or Nurse Freeman-Walker did not take Mr. Vanausdal to the hospital when he had an elevated heart rate because Dr. Callwood

knew his medicine was en route and she knew the prescription could not be found on the island after talking to the Virgin Islands hematologist.[125] They argue not taking Mr. Vanausdal to the hospital may be, at most, medical malpractice but not a constitutional violation because incarcerated individuals do not have an independent constitutional right to outside medical care.[126] The state actors argue Mr. Vanausdal's situation is different than *Goodnight v. Lester*, where Judge DeGiusti found a hemophiliac detainee stated a claim for deliberate indifference.[127] They argue Nurse Freeman-Walker was not deliberately indifferent because she monitored Mr. Vanausdal's condition and was generally proactive about his care.[128] The corrections officers were not deliberately indifferent because Mr. Vanausdal lost consciousness slowly; "he did not have a sudden event, which would have produced immediate action."[129] The corrections officers called medical services when Mr. Vanausdal became unresponsive and one of them gave him CPR.[130] Not calling for help soon enough or attempting CPR for long enough might constitute negligence or medical malpractice but not deliberate indifference.[131]

Personal Representative Cariveau responds Dr. Callwood acted with deliberate indifference because she did not offer to pay for shipping costs for Mr. Vanausdal's medicine, she discarded "just-expired medication" even though Mr. Vanausdal had already begun experiencing symptoms of a hemorrhage, and she chose not to transfer him to a hospital where medical professionals may have been able to treat his hemorrhage until his medicine arrived.[132] He claims Nurse Freeman-Walker displayed deliberate indifference because she noticed Mr. Vanausdal's swollen ankle and discarded his medication although she knew he had not taken a dose for seven days.[133] He argues the corrections officers were deliberately indifferent because they delayed rendering aid when Mr. Vanausdal started to lose consciousness.[134]

The state actors counter by identifying inconsistencies between the allegations and Personal Representative Cariveau's response.[135] They argue we should not accept as true the argument in Personal Representative Cariveau's response Accredo refused to ship the medicine and Dr. Callwood refused to pay for it because it would cost $500; as pleaded in the amended Complaint, Dr. Callwood *agreed* Accredo could submit an invoice for shipping costs.[136] The state actors also claim the allegation Dr. Callwood and/or Nurse Freeman-Walker discarded Mr. Vanausdal's expired medicine is implausible because elsewhere Personal Representative Cariveau pleads Mr. Vanausdal did not have excess medicine on his person.[137] The allegation Mr. Vanausdal did not have excess medication is confirmed by what Mr. Vanausdal told an unidentified judge on May 6, 2022.[138] The state actors excerpt this testimony for the first time in their reply.[139] The state actors also argue Personal Representative Cariveau's argument in his response Mr. Vanausdal died alone in his cell is inconsistent with his allegations the corrections officers were present when Mr. Vanausdal died.[140]

We agree there are inconsistencies between Personal Representative Cariveau's amended Complaint and his response and we note additional inconsistencies the state actors do not address. The alleged facts relevant to a theory of deliberate indifference concern the discarded medication, the refusal to cover shipping costs of the medicine, the failure to transfer Mr. Vanausdal to the hospital, and the corrections officers' delayed or inadequate attempts to resuscitate Mr. Vanausdal. We address each of these in turn to determine whether Personal Representative Cariveau plausibly alleges deliberate indifference.

### *Discarding expired specialty medicine before knowing of available substitutes.*

We first address the state actors' argument Personal Representative Cariveau does not plausibly allege Dr. Callwood and/or Nurse Freeman-Walker threw out Mr. Vanausdal's expired

medicine because the allegations are internally inconsistent, and Mr. Vanausdal swore in court he did not have excess medicine. We agree the allegation Mr. Vanausdal had no excess medicine (and his testimony to that effect) seemingly conflicts with the allegation medical staff threw out an expired dose of medicine but we decline to "disregard these allegations" as the state actors request.[141] First, the state actors raised this argument for the first time in their reply instead of raising it in their Motion. This tactic is improper under Local Rule of Civil Procedure 7.1(c)(3), which states "[a] reply shall respond to the arguments presented in the memorandum in response and shall not raise new issues that do not respond to the arguments."[142] Second, we can think of plausible explanations for these apparent inconsistencies: Mr. Vanausdal did not have medicine **besides the expired dose**, or maybe the word "excess" is intended to suggest he did not have enough medicine for the entirety of his detention. We need the full record to determine the plausibility of the allegations and we do not think the state actors' argument about inconsistencies, raised for the first time in their reply, warrants dismissal at this stage.

We note a few inconsistencies beyond those identified by the state actors. For instance, it is unclear from the allegations **who** threw out Mr. Vanausdal's medicine.  Personal Representative Cariveau alleges Dr. Callwood made the decisions regarding Mr. Vanausdal's medical care, including the decision to discard his expired medication. He alleges the only real involvement Nurse Freeman-Walter had in Mr. Vanausdal's treatment was noticing his swollen ankle and speaking to someone at Accredo about sending the medicine via FedEx. The averments in Count III (deliberate indifference against Dr. Callwood) are consistent with the factual allegations: Personal Representative Cariveau again alleges Dr. Callwood had decision-making power and threw out the medicine. But in Count IV (deliberate indifference against Nurse Freeman-Walter), Personal Representative Cariveau contradicts his earlier allegations and pleads Nurse Freeman-

Walter had decision-making authority and ***Nurse-Freeman Walter***, not Dr. Callwood, threw out the medicine. The Count IV allegations against Nurse-Freeman Walter are both conclusory and contradictory given the earlier allegations swear (under Rule 11) Nurse Freeman-Walter only checked Mr. Vanausdal's ankle and spoke to someone from Accredo about the FedEx shipment. The state actors do not address these inconsistencies; they instead group Dr. Callwood and Nurse Freeman-Walker together and argue their actions were not deliberately indifferent. We think it unlikely, based on the pleadings, Nurse Freeman-Walker had enough personal involvement with Mr. Vanausdal's treatment to meet the standard for deliberate indifference, but because the state actors do not differentiate between Dr. Callwood's personal involvement and Nurse Freeman-Walker's personal involvement, we will not either.

Assuming for the purposes of deciding this Motion Dr. Callwood and Nurse Freeman-Walker both had a hand in discarding the medicine, we think Personal Representative Cariveau plausibly alleges deliberate indifference. We are not persuaded by the state actors' argument throwing out expired medicine could not be a constitutional violation because it may have been negligent to give Mr. Vanausdal expired medicine. The case the state actors cite, *Pannebaker v. Trotta*, is plainly distinguishable.[143] There, Judge Bloom found giving an incarcerated individual prescribed medicine which made him sick could amount to medical negligence but not deliberate indifference.[144] The state actors rely on this case to suggest the inverse must also be true—i.e., throwing out expired medicine cannot amount to deliberate indifference because administering it might be negligent. This argument is not only a logical fallacy, but it also ignores important facts before us today but not present in *Pannebaker*. There, a doctor allegedly prescribed expired medicine to an individual incarcerated ***in Pennsylvania***, where presumably nonexpired medicine was available.[145] We cannot assume Judge Bloom would have found medical negligence if the

same scenario took place in St. Thomas and the doctor gave an incarcerated person expired medicine because no other antibiotics were available. Unlike in *Pannebaker*, Dr. Callwood and/or Nurse Freeman-Walker allegedly discarded Mr. Vanausdal's expired medicine **with no other medicine on the island**. Evidence may suggest medical professionals in the Virgin Islands would be aware of the substantial risk of discarding a hemophiliac's remaining doses of medicine, even if they were expired. Personal Representative Cariveau plausibly alleges Dr. Callwood and/or Nurse Freeman-Walker behaved with deliberate indifference by throwing out the medicine.

### *Refusal to pay for shipping costs to transport the medicine to the island.*

Personal Representative Cariveau does not plausibly allege deliberate indifference with respect to Dr. Callwood's alleged failure to offer to pay shipping costs. The state actors again note inconsistencies between Personal Representative Cariveau's allegations and the arguments his response; he, in the amended Complaint, alleges Dr. Callwood agreed Accredo could invoice her for the costs while the response claims Dr. Callwood did not offer to cover the cost of shipping.[146] We again find the state actors improperly raise an argument for the first time in their reply under Local Rule 7.1(c)(3).

In any event, we do not need to consider the inconsistencies between the amended Complaint and the response because the allegations alone are insufficient for us to infer deliberate indifference. Personal Representative Cariveau alleges someone from the Accredo pharmacy told her on May 9, 2022 they would not send the medicine to St. Thomas because they had sent the medicine to Mr. Vanausdal's home address on May 3, 2022.[147] Accredo's alleged reason for not sending the medicine did not involve cost of shipping. Dr. Callwood contacted Mr. Vanausdal's girlfriend, Taylor Hayes, the same day and told her to overnight the medicine; the Bureau of Corrections would pay for the customs fee.[148] Dr. Callwood allegedly did not offer to pay for the

22

shipment but there is no allegation Ms. Hayes asked for the Bureau to pay or even knew it would cost $500 dollars at that time.[149] Dr. Callwood seemingly did not realize Ms. Hayes was ***not*** shipping the medicine until Accredo contacted her on May 12 and told her Ms. Hayes had contacted the pharmacy and said she could not afford to pay for shipping.[150] At this time Dr. Callwood said Accredo could submit an invoice for the shipping costs.[151] Accredo informed Nurse Freeman-Walter the next day it was shipping the medicine via FedEx.[152] It is unclear from the allegations why Accredo decided to send the medicine when it originally said it would not send it because of the prescription filled on May 3. But seemingly Dr. Callwood believed Ms. Hayes would send the medicine from the time of their conversation on May 9 until Accredo contacted Dr. Callwood on May 12 and told her otherwise—at which time she told Accredo the Bureau would cover the cost of direct mailing, and Accredo agreed to ship the medicine. We do not see anything deliberately indifferent about this series of events even given our deference to the pleadings.

### *Refusal to transfer Mr. Vanausdal to the hospital.*

Personal Representative Cariveau plausibly alleges deliberate indifference regarding the decision not to transfer Mr. Vanausdal to the hospital. We consider the state actors' position this is a case involving inadequate medical care, not a denial of medical care, and under *Pearson v. Prison Health Services*, "'mere disagreement as to the proper medical treatment' does not establish deliberate indifference."[153] It is true Personal Representative Cariveau alleges inadequate treatment, not denial of care.[154] But our Court of Appeals in *Pearson* studied deliberate indifference at the summary judgment stage, not the motion to dismiss stage.[155] The court found medical expert testimony or extrinsic proof might be necessary to determine whether a particular treatment fell below the professional standard of care in an inadequate medical care.[156] On the

other hand, "where it would be apparent to a layperson that his medical treatment violated a professional standard of care . . . extrinsic proof [is] not necessary to survive summary judgment . . . ."[157] We do not think our Court of Appeals's analysis in *Pearson* supports dismissal of Personal Representative Cariveau's claims at this stage. Rather, *Pearson* goes to the evidence needed to establish deliberate indifference at summary judgment.

The state actors also cite to *Palakovic v. Wetzel* for the proposition "federal courts are generally reluctant to second guess medical judgments" where a detainee or incarcerated individual has received ***some*** medical attention.[158] But our Court of Appeals recognized in *Palakovic* "there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements."[159] Our Court of Appeals vacated the district court's orders of dismissal because the Palakovics sufficiently alleged the minimal treatment their incarcerated son received in prison "fell below constitutionally adequate standards," and the prison's health care personnel "were deliberately indifferent to [his] serious medical needs."[160] So, *Palakovic* actually undermines the state actors' argument.

We also study *Estate of Henson v. Krajca*, where a nurse's failure to transport an incarcerated individual with elevated vital signs to the hospital constituted malpractice, not deliberate indifference, *Bennett v. Virgin Islands*, which the state actors cite in support of the argument "a prisoner has no independent constitutional right to medical care outside of prison[,]" and *Roberts v. Spalding*, where the Court of Appeals for the Ninth Circuit held a "doctor's discretion to determine that supplemental medical care is not warranted remains essentially unfettered."[161] None of these cases helps the state actors. The Court of Appeals for the Fifth Circuit in *Krajca* reversed the district court's denial of summary judgment because "[t]here [was] no evidence in the record that Henson's vital signs constituted a dangerously high reading and

warranted a particular course of treatment[,]" meaning the plaintiffs could not show Nurse Krajca exhibited deliberate indifference to an excessive risk to Mr. Henson's health.[162] Here, we do not have the benefit of the record to determine whether Dr. Callwood and/or Nurse Freeman-Walker were deliberately indifferent in deciding not to transfer Mr. Vanausdal to the hospital. Personal Representative Cariveau alleges Mr. Vanausdal exhibited symptoms indicative of hemorrhage, but Dr. Callwood and Nurse Freeman-Walker did nothing, which is sufficient to plead deliberate indifference at this stage.

The analysis offered in *Bennett* and *Roberts* are also unpersuasive. The state actors are correct Judge Brotman in *Bennett* acknowledged incarcerated individuals have no independent constitutional right to medical care outside of a prison.[163] *Bennett* is distinguishable from our case, though, because the facility physician in *Bennett* recommended state actors transport an incarcerated person to a surgical clinic, which they did, but the surgeon refused to treat him without his medical records.[164] By contrast, Dr. Callwood and/or Nurse Walter-Freeman never took Mr. Vanausdal to the hospital. The analysis in *Roberts* is distinguishable because there, the Court of Appeals for the Ninth Circuit held Washington regulations allowing incarcerated individuals to obtain supplemental medical care did not create a protected liberty interest in such treatment under the due process clause of the Fourteenth Amendment.[165] The court of appeals discussed the "unfettered" nature of a doctor's discretion to refuse supplemental medical care **under the Washington regulations**.[166] We do not find *Roberts* relevant to our analysis of what the Constitution required of Dr. Callwood and/or Nurse Freeman.

We are further unpersuaded by the state actors' argument Dr. Callwood and/or Nurse Walker-Freeman were not deliberately indifferent by keeping Mr. Vanausdal at the Jail because his medicine was en route and Dr. Callwood believed no treatment was available on the island.[167]

As Personal Representative Cariveau points out, the full resources of a hospital could have mitigated or delayed the effects of the deadly hemorrhages until the medication could arrive[]" even if the hospital itself did not have the medicine.[168]

Finally, like Personal Representative Cariveau, we find the alleged facts in this case are similar to those in *Goodnight v. Lester*. Judge DeGiusti in *Goodnight* concluded a detained hemophiliac stated a claim for deliberate indifference arising from an arrest where police officers injured his leg.[169] The detainee told the officers he had hemophilia, but the officers took his medical alert tag and told them they could do nothing for him despite the visibly worsening condition of his injured leg.[170] The officers in *Goodnight* provided no medical attention to the detainee, whereas Dr. Callwood and/or Nurse Freeman-Walker at least monitored Mr. Vanausdal and attempted to get him medicine, but we nevertheless think the decision not to take Mr. Vanausdal to the hospital suggests they "knew of and disregarded a substantial risk of harm" like the correctional facility employees in *Goodnight*.[171] Personal Representative Cariveau plausibly alleges Dr. Callwood and/or Nurse Freeman-Walker behaved with deliberate indifference by keeping Mr. Vanausdal at the Jail.

### *Attempts to resuscitate Mr. Vanausdal.*

Personal Representative Cariveau plausibly alleges deliberate indifference with regard to the two corrections officers who saw Mr. Vanausdal die. The state actors argue "Mr. Vanausdal slowly became unresponsive; he did not have a sudden event, which would have produced immediate action."[172] So, the fact the corrections officers did not start CPR or call for medical assistance until Mr. Vanausdal became unresponsive does not show deliberate indifference.[173] We disagree.

The cases the state actors cite are not persuasive. Our Court of Appeals's analyses in *Woloszyn v. County of Lawrence* and *Abran v. City of Philadelphia* are not instructive because, as Personal Representative Cariveau points out, both of them involved prison guards who performed CPR immediately after encountering a suicide attempt.[174] Judge Sharpe's opinion in *Cooper v. Clancy* is factually closer but still distinguishable; the case involved corrections officers who used force on an incarcerated individual, causing him to collapse.[175] The corrections officers delayed bringing Mr. Cooper to the infirmary for fifteen to twenty-five minutes.[176] Once at the infirmary, medical staff performed CPR and other lifesaving measures, but Mr. Cooper died.[177] His wife sued for deliberate indifference to serious medical needs.[178] Judge Sharpe granted summary judgment in favor of the defendants on claims the individual did not receive prompt and proper CPR once at the infirmary but denied summary judgment on the claim the corrections officers delayed medical treatment by waiting fifteen minutes or more to bring the individual to the infirmary.[179]

The state actors cite *Cooper* to support dismissal of the claims against the corrections officers, who "started CPR and called for medical assistance when Mr. Vanausdal became unresponsive."[180] But Judge Sharpe found a delay in treatment can constitute deliberate indifference if a prison guard or corrections officer knows the situation is life-threatening.[181] Even assuming the corrections officers did not exhibit deliberate indifference by waiting until Mr. Vanausdal was unresponsive to start CPR, that does not explain why they did not call for medical assistance during the thirty preceding minutes where Mr. Vanausdal slowly lost consciousness. We are not convinced the fact Mr. Vanausdal did not have a "sudden event" justifies waiting until he was fully unresponsive to call for help. As with Dr. Callwood and Nurse Freeman-Walker, we decline to decide whether the corrections officers' inaction constituted deliberate indifference without the benefit of the full record.[182]

### 2. Personal Representative Cariveau does not plead the individual liability of Director Testamark or Governor Bryant.

Personal Representative Cariveau does not plausibly allege deliberate indifference as to Director Testamark and Governor Bryan. He cannot rely on a *respondeat superior* theory and must allege personal involvement either through participation or acquiescence or through policymaking.[183]

The state actors argue Personal Representative Cariveau does not plead Director Testamark and Governor Bryant "had actual knowledge of Mr. Vanausdal's health circumstances, that they had personal involvement in Dr. Callwood's medical decisions and efforts to obtain Mr. Vanausdal's medications, or that they acquiesced in any wrongdoing."[184] The state actors acknowledge a policymaker can be held liable for deliberate indifference if they maintain a policy, practice, or custom which directly harms a detainee, but they argue the decisions of Dr. Callwood and/or Nurse Freeman-Walker not to take Mr. Vanausdal to the hospital or timely obtain his medicine were not based on any practice or policy insinuated by the Director or Governor.[185] The state actors argue the corrections officers' delay in calling medical services likewise was not the result of a policy or practice.[186]

Personal Representative Cariveau responds "the complaint clearly alleges that Director Testamark and Gov. Bryan were both personally aware of Plaintiff's serious medical condition, his deterioration . . . his need for medication, and the fact that emergency treatment that [sic] was unavailable at the Jail, but they were deliberately indifferent."[187] Even if they did not have actual knowledge of Mr. Vanausdal's condition, Director Testamark and Governor Bryan can be held liable as policymakers because Mr. Vanausdal will come forward with evidence during discovery showing they were responsible for developing policies and procedures.[188] Policymakers are also liable if a problem is reported to them but they do nothing to fix it, and here, Director Testamark

28

and Governor Bryan "both actually knew" of Mr. Vanausdal's situation but did not protect him by sending him to the hospital or obtaining his medicine.[189] The state actors reply the "bald allegations" about Director Testamark and Governor Bryan are insufficient to overcome the Motion to dismiss, and the "sheer possibility" of wrongdoing does not satisfy the plausibility standard under *Ashcroft v. Iqbal*.[190]

We agree with the state actors. The allegations about Director Testamark and Governor Bryan are precisely the type of "conclusory statements" the Supreme Court warned against in *Iqbal*.[191] Personal Representative Cariveau pleads Director Testamark and Governor Bryan knew Mr. Vanausdal had hemophilia, needed medicine and care the Jail did not have or could not provide, and knew his condition was worsening.[192] But he does not plead how the Director and the Governor knew about these things; for instance, he does not allege they visited the Jail during Mr. Vanausdal's detention or received a report of the issues involving Mr. Vanausdal's care.

We agree with Personal Representative Cariveau "[t]he complaint has to be taken as true."[193] But, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."[194] "[M]ere conclusions[] are not entitled to the assumption of truth. . . . they must be supported by factual allegations."[195] Personal Representative Cariveau's allegations about Director Testamark and Governor Bryan's supposed personal involvement are not supported by factual allegations.

The same holds true under the theory a supervisor may be liable for a constitutional violation resulting from a policy, practice, or custom put into effect by the supervisor. First, it is not clear Director Testamark and Governor Bryan were "supervisors" of the St. Thomas Jail as Personal Representative Cariveau does not allege the nature of their roles with specificity. He pleads in a conclusory fashion Director Testamark "was the director for the [Virgin Islands Bureau

of Corrections] and responsible for all treatment for the inmates at the St. Thomas jail facility," and Governor Bryan "was the Governor of the US Virgin Islands responsible for all treatment for the inmates at the St. Thomas Jail facility . . . ."[196] Personal Representative Cariveau does not allege Director Testamark and Governor Bryan were the supervisors of Dr. Callwood, Nurse Walker-Freeman, and the corrections officers.

Personal Representative Cariveau also does not plead the Director and the Governor put into effect a policy, practice, or custom resulting in a constitutional violation. He alleges a 2013 settlement agreement between the Virgin Islands Government, the Virgin Islands Bureau of Corrections, and the American Civil Liberties Union requires, among other things, timely medical care for acute conditions and continuity of medications for newly admitted prisoners, which the Bureau of Corrections had yet to fully comply with during Mr. Vanausdal's detention.[197] He also alleges Director Testamark and Governor Bryan continued to house inmates despite knowing about the limited access to medical treatment.[198] He alleges Director Testamark and Governor Bryan allegedly knew "the Government of the US Virgin Islands and [Virgin Islands Bureau of Corrections] had . . . longstanding and widespread practice[s]" of failing to transport incarcerated individuals to hospitals, provide them with adequate medication, activate ambulance services,  and arrange for specialty medical services.[199]

Personal Representative Cariveau's identical conclusory allegations as to both Director Testamark and Governor Bryan are insufficient. We cannot infer both individuals personally established and maintained practices in violation of the 2013 settlement agreement based on Personal Representative Cariveau's general allegations the Virgin Islands Government and Bureau of Corrections maintained such practices.

Our Court of Appeals has recognized "perhaps the easiest way . . . a plaintiff can make out a supervisor liability claim is by showing that 'the supervisory official failed to respond appropriately in the face of an awareness of a pattern of such injuries.'"[200] It is conceivable the "preventable" deaths of two past detainees pleaded in the amended Complaint might constitute a pattern for the purposes of supervisory liability except for two issues: Personal Representative Cariveau (1) does not—as noted above—indicate whether the Director and Governor in fact had supervisory roles at the Jail, and (2) does not plead the two earlier deaths occurred because of inadequate medical care as in Mr. Vanausdal's case. Without more, Personal Representative Cariveau's pleadings as to Director Testamark and Governor Bryan rely impermissibly on a *respondeat superior* theory of liability.

We cannot infer they were involved with Mr. Vanausdal's medical care and eventual death solely because of their positions as Director and Governor. We dismiss the claims against them.

### 3. Dr. Callwood, Nurse Freeman-Walker, and the corrections officers are not entitled to qualified immunity based on the allegations.

We turn next to whether Dr. Callwood, Nurse Freeman-Walker, and the corrections officers enjoy qualified immunity at this stage from the deliberate indifference claim.[201] We find the state actors do not meet their burden establishing they are entitled to qualified immunity.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[202] "A right is clearly established if the case law at the time of the alleged violation of the right would have put government officials on fair notice that their conduct violated the plaintiff's rights."[203] "That is 'an objective (albeit fact-specific) question, where an officer's subjective beliefs are irrelevant.'"[204] The Supreme Court's "case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional

question beyond debate."[205] "In analyzing the 'clearly established law' prong, we proceed in two steps: we first 'define the right allegedly violated at the appropriate level of specificity' and then 'ask whether that right was "clearly established" at the time of its alleged violation.'"[206] "[T]he clearly established right must be defined with specificity[,]" and "not . . . at a high level of generality."[207] We analyze this question "in light of the specific context of the case . . . ."[208] In "exceedingly rare cases . . . the existence of the plaintiff's constitutional right is so manifest that it is clearly established by broad rules and general principles."[209] "[Q]ualified immunity will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint."[210] "[T]he burden of pleading qualified immunity rests with the defendant, not the plaintiff."[211]

The state actors argue they are entitled to qualified immunity because the steps they should have taken are not so obvious every reasonable government official would have known the appropriate action to take.[212] With respect to Dr. Callwood and Nurse Freeman-Walker, no precedent indicates what else they could have done to obtain Mr. Vanausdal's medicine; "it is not clearly established that the hospital could have treated Mr. Vanausdal . . . ."[213] With respect to the corrections officers, they "did not act unreasonably" in administering medical care and calling for emergency services after he became unresponsive.[214]

Personal Representative Cariveau responds the state actors were on notice failure to provide medicine and failing to treat or transfer Mr. Vanausdal to the hospital would constitute deliberate indifference.[215] The state actors reply "it is obvious that a detainee requiring life-saving medication must be given it . . . if the medication were available or could be obtained[,]" but Personal Representative Cariveau does not cite cases where prison officials did everything they

could to obtain medicine and were found deliberately indifferent simply because they could not get the medicine in time.[216]

We are persuaded by Personal Representative Cariveau's arguments; the state actors have not met their burden to show qualified immunity at this stage. We start by defining the right allegedly violated at the appropriate level of specificity. The state actors do not offer their own definition of the right but instead argue they did not violate a clearly established right because it is not clearly established the outcome would have been better if they had acted differently.[217]

The state actors misstate the standard for qualified immunity. Their position—Dr. Callwood and Nurse Freeman-Walker did not violate a clearly established right unless Personal Representative Cariveau can prove the steps they **should have** taken would have had a better outcome for Mr. Vanausdal—is incorrect. They are essentially arguing they did not violate a clearly established constitutional right because Mr. Vanausdal might have died even if they had taken him to the hospital. But getting past the defense of qualified immunity does not require a plaintiff to prove a constitutional violation would not have resulted had the state actor acted differently. The state actors' argument the corrections officers "did not act unreasonably" is also uncompelling. The supposed reasonableness of the corrections officers' actions goes to the deliberate indifference inquiry, which we already decided; it does not help us decide whether they violated a clearly established right.

Personal Representative Cariveau's proposed definition of the clearly established right is seemingly the right to "medication necessary to life" and the right to be transferred "somewhere that could offer care[.]"[218] But this proposed definition does not account for the important fact Dr. Callwood and Nurse Freeman-Walker could not obtain other medicine on the island. As the state actors counter, "[w]hat is lacking is the scienter element."[219] Yet the lacking scienter element only

applies to the state actors' inability to obtain new medicine, and we already decided their alleged attempts to obtain new medicine (concerning shipping logistics, etc.) did not rise to the level of deliberate indifference.[220] The scienter argument does not help the state actors show qualified immunity for Dr. Callwood's and Nurse Walker-Freeman's other actions.

We still need to decide whether Dr. Callwood and/or Nurse Freeman-Walker violated a clearly established right by throwing out Mr. Vanausdal's expired medicine and not taking him to the hospital. With regard to these allegations, we think Personal Representative Cariveau's proposed definition is reasonable. "Put simply, a detainee's right to adequate medical care is clearly established."[221] We think Dr. Callwood and/or Nurse Freeman-Walker were on fair notice their alleged actions—discarding expired medicine when no other medicine was available on the island and declining to take Mr. Vanausdal to a hospital where staff may have mitigated his symptoms—could violate his right to adequate medical care.[222] We decline to dismiss these allegations against Dr. Callwood and Nurse Freeman-Walker based on the defense of qualified immunity. We likewise decline to dismiss the allegations against the corrections officers as the state actors provide no argument we should find the corrections officers are entitled to qualified immunity beyond claiming they acted reasonably.

### 4.  We dismiss the untimely survival claim.

The last issue is the statute of limitations on Personal Representative Cariveau's survival action under 5 V.I.C. § 77. We find his survival claim untimely.

The Virgin Islands Legislature through its survival statute provides: "A thing in action arising out of a wrong which results in physical injury to the person or out of a statute imposing liability for such injury shall not abate by reason of the death of the wrongdoer or any other person liable for damages for such injury, nor by reason of the death of the person injured or of any other

person who owns any such thing in action."[223] If the person entitled to bring a survival action dies before judgment, the damages go to the person's estate.[224] The general statute governing time for commencement of various actions sets a two-year statute of limitations for "any injury to the person or rights of another not arising on contract and not herein especially enumerated . . . ."[225] But section 37(a) provides "[i]f a person entitled to bring an action dies before the expiration of the time limited for the commencement thereof, and the cause of action survives, an action may be commenced by his personal representatives, after the expiration of the time and within one year from his death."[226]

The state actors argue Personal Representative Cariveau's survival action is untimely because, applying Judge Donohue's analysis in *Der Weer v. Hess Oil Virgin Islands Corporation*, section 37(a) gives a personal representative only one year to pursue the claim from the date of Mr. Vanausdal's death, and Personal Representative Cariveau brought this claim two years after Mr. Vanausdal's death.[227] Personal Representative Cariveau responds *Der Weer* is not binding, the case concerned a wrongful death claim so Judge Donohue's commentary on survival actions is "dicta," and Judge Donohue misconstrued section 37(a) because "[t]he statute is meant to extend the limitations period to at least one year after death."[228] Personal Representative Cariveau also argues the statute of limitations is two years under section 78.[229] The state actors reply a survival action must be commenced at most one year after death under the statute's plain language and Judge Willocks in *Jeremiah v. V.I. Department of Human Services* reaches the same conclusion as Judge Donohue in *Der Weer*.[230] Personal Representative Cariveau's reference to section 78 is misguided because it only applies to the substitution of parties.[231]

In short, the state actors' position is section 37(a) can either increase or decrease the statute of limitations on a survival action depending on when the individual dies and Personal

Representative Cariveau's position is section 37(a) can **only** increase the statute of limitations but never decrease it.

We agree with the state actors based on the plain language used by the Legislature. It may appear unfair to reduce the statute of limitations in a survival action but those arguments must be presented to the elected representatives. The state actors' position is supported by Judge Donohue's thoughtful analysis in *Der Weer* on the statute of limitations for survival actions in the Virgin Islands. He explained: "Generally, a tort claim is subject to a two year statute of limitations."[232] "If [the injured person] dies before the two years has passed, section 37(a) gives his personal representative a year from the date of his death to pursue the claim."[233] "Depending on how long someone lives after being injured, the length of time to file a lawsuit may vary."[234] "For example, if a person dies two years to the exact day of her injury, section 37(a) would extend the time to pursue that claim as a survival action for an additional year, resulting in that claim being actionable for a total of three years after the date of injury."[235] "In contrast, if a person dies on the same day that he is injured, section 37(a) would shorten the length of time a personal representative has to pursue his claim in a survival action to 'within one year from his death.'"[236] "While the discrepancy may seem unfair, it has to be seen in the light of the common law, which extinguished all tort claims upon death."[237]

This analysis concluding personal injury claims continue for one year upon the passing of the injured party under Virgin Islands law makes sense. Judge Donohue's analysis has the added benefit of elucidating what happens when an individual dies on the date of injury. This example is instructive for our purposes, as Personal Representative Cariveau pleads a series of injuries to Mr. Vanausdal, the last of which occurred on May 16, 2022, the date of Mr. Vanausdal's death. Under Judge Donohue's analysis, the statute of limitations started to run on May 16, 2022 and expired

one year later. As the state actors point out, Judge Donohue is not the only judge to reach this conclusion; Judge Willocks in *Jeremiah* also dismissed a personal representative's survival claim for failure to bring it within one year from the decedent's death.[238]

Personal Representative Cariveau does not make a compelling argument or cite authority for the proposition section 37(a) can only extend the statute of limitations period and not shrink it. He cites without explanation to *Martinez v. Hess Oil Virgin Islands Corporation* and *Ramos v. Abramson Enterprises, Inc.,* but neither case supports his position. Judge Molloy's analysis in *Martinez* concerns the two-year statutory deadline to substitute parties after death set forth in section 78.[239] Judge Cabret's analysis in *Ramos* focuses on the tolling effect of section 36, which concerns disabled persons, on the two-year statute of limitations applicable to personal injuries.[240] We are not addressing substituted parties or persons under disability so we cannot see how these cases are relevant. Without authority to the contrary, we are persuaded by the plain reading of the legislation and Judge Donohue's reasoning in *Der Weer.* Personal Representative Cariveau's survival claim is untimely.[241]

### C.  We grant Mr. Cariveau leave to amend his section 1983 claims against Director Testamark and Governor Bryan but deny him leave to amend his survival claim.

Personal Representative Cariveau alternatively requests leave to amend his Complaint to cure deficiencies.[242] The only claims we are dismissing at this stage are his constitutional claims against Director Testamark and Governor Bryan and his survival claim against all of the state actors. We grant Personal Representative Cariveau leave to amend his Complaint consistent with our upcoming trial scheduling Order to allege personal involvement by Director Testamark and Governor Bryan if he can do so based on discovery consistent with his Rule 11 obligations. We deny him leave to amend his survival claim against the state actors because amendment would be futile.[243]

## III.  Conclusion

We deny the specialty pharmacy companies' Motion to dismiss. We grant in part and deny in part the state actors' Motion to dismiss. Personal Representative Cariveau may proceed with his deliberate indifference constitutional claims against Dr. Callwood, Nurse Freeman-Walker, and the corrections officers for discarding Mr. Vanausdal's expired medication, not taking him to the hospital, and not calling for medical assistance when he grew unresponsive in his cell. Personal Representative Cariveau's deliberate indifference claim against Warden Smittie may proceed in its entirety as the state actors did not move to dismiss it. We dismiss Personal Representative Cariveau's claims against Director Testamark and Governor Bryan without prejudice for failure to allege their personal involvement. We dismiss the survival claim with prejudice.

---

[1] ECF 9 ¶ 21.

[2] *Id.*

[3] *Id.*

[4]  *Id.* ¶ 22.

[5] *Id.* ¶¶ 23–24.

[6] *Id.* ¶¶ 23, 28.

[7] *Id.* ¶¶ 28, 45.

[8] *Id.* ¶¶ 31, 33.

[9] *Id.* ¶

[10] *Id.* ¶ 30.

[11] *Id.* ¶ 32.

[12] *Id.*

[13] *Id.* ¶ 33.

---

[14] *Id.* ¶¶ 87–88.

[15] *Id.* ¶ 90.

[16] *Id.* ¶ 91.

[17] *Id.* ¶¶ 92–96. Personal Representative Cariveau alleges 2019 and 2020 deaths of detainees at the St. Thomas Jail.

[18] *Id.* ¶ 36.

[19] *Id.*

[20] *Id.* ¶ 37.

[21] *Id.* ¶ 38.

[22] *Id.* ¶ 39.

[23] *Id.* ¶ 40. Personal Representative Cariveau frequently alleges communications with "ACCREDO DEFENDANTS" without specifying which entity Dr. Callwood contacted, *e.g.*, *id.* ¶¶ 40–44, but we assume this group pleading refers primarily to a specialty pharmacy as alleged in paragraphs 53–55. The Defendants do not presently challenge this collective pleading. And we appreciate discovery will assist the Personal Representative in identifying the speakers and narrowing his claims. But a jury will need to separately decide each Defendant's liability and potential damages owed to the Estate.

[24] *Id.* ¶ 41.

[25] *Id.* ¶ 42.

[26] *Id.* ¶¶ 43–44.

[27] *Id.* ¶ 46.

[28] *Id.*

[29] *Id.* ¶ 47.

[30] *Id.* ¶ 48.

[31] *Id.* ¶ 49.

[32] *Id.* ¶ 50.

[33] *Id.* ¶ 51.

[34] *Id.* ¶ 52.

[35] *Id.* ¶ 53.

[36] *Id.* ¶ 54.

[37] *Id.* ¶ 55.

[38] *Id.* ¶ 56.

[39] *Id.* ¶ 59.

[40] *Id.*

[41] *Id.* ¶ 60.

[42] *Id.* ¶ 62.

[43] *Id.*

[44] *Id.* ¶ 63.

[45] *Id.* ¶ 64.

[46] *Id.*

[47] *Id.* ¶ 65.

[48] *Id.* ¶ 63.

[49] *Id.*

[50] 5 V.I.C. § 77. *See generally id.*

[51] ECF 9 ¶¶ 6–9, 15–17.

[52] *Id.* ¶¶ 99–111, 303–05.

[53] ECF 39. Mr. Cariveau does not distinguish between the Accredo parties in his amended Complaint, nor does he plead their relationship to one another, so we refer to them collectively as "Accredo."

[54] ECF 37. Warden Smittie did not move to dismiss. He also did not answer and is technically in default. Personal Representative Cariveau did not seek default. But all claims against him remain and we grant him leave to answer along with the other state actors in today accompanying Order.

---

[55] The state actors move to dismiss for failure to state a claim and on statute of limitations grounds under Rule 12(b)(6). Accredo moves to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). There are two types of challenges under Rule 12(b)(1): facial challenges and factual challenges. "A facial attack contests the sufficiency of the pleadings, whereas a factual attack contests the sufficiency of jurisdictional facts." *D'Andrea v. U.S. Army Corps of Eng'rs*, No. 21-9569, 2023 WL 4103929, at \*4 (D.N.J. June 20, 2023) (citing *Lincoln Ben. Life Co. v. AEI Life, L.L.C.*, 800 F.3d 99, 105 (3d Cir. 2015)). Accredo's challenge is a facial attack because it relies on the pleadings. The standard applied to a facial attack on our subject matter jurisdiction is the same as the standard applied to a motion to dismiss for failure to state a claim on which relief may be granted under Rule 12(b)(6). *Petruska v. Gannon Univ.*, 462 F.3d 294, 299 (3d Cir. 2006) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). The purpose of Rule 12(b)(6) is to test the sufficiency of the factual allegations in a complaint. *Sanders v. United States*, 790 F. App'x 424, 426 (3d Cir. 2019). If a plaintiff is unable to plead "enough facts to state a claim to relief that is plausible on its face," the court should dismiss the complaint. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Kajla v. U.S. Bank Nat'l Ass'n as Tr. for Credit Suisse First Boston MBS ARMT 2005-8*, 806 F. App'x 101, 104 n.5 (3d Cir. 2020) (quoting *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011)).

"A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting A*shcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While "[t]he plausibility standard is not akin to a 'probability requirement,'" it does require the pleading show "more than a sheer possibility that a defendant has acted unlawfully." *Riboldi v. Warren Cnty., Dep't of Hum. Servs. Div. of Temp. Assistance & Soc. Servs.*, 781 F. App'x 44, 46 (3d Cir. 2019) (alteration in original) (quoting *Iqbal*, 556 U.S. at 678). "A pleading that merely 'tenders naked assertion[s] devoid of further factual enhancement' is insufficient." *Id.* (alteration in original) (quoting *Iqbal*, 556 U.S. at 668).

In determining whether to grant a Rule 12(b)(6) motion, "we accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff" but "disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *Robert W. Mauthe, M.D., P.C. v. Spreemo, Inc.*, 806 F. App'x 151, 152 (3d Cir. 2020) (quoting *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878–79 (3d Cir. 2018)). Our Court of Appeals requires us to apply a three-step analysis to a 12(b)(6) motion: (1) "we 'tak[e] note of the elements a plaintiff must plead to state a claim'"; (2) "we 'identify allegations that . . . "are not entitled to the assumption of truth"' because those allegations 'are no more than conclusion[s]'"; and, (3) "'[w]hen there are well-pleaded factual allegations,' we 'assume their veracity' in addition to assuming the veracity of 'all reasonable inferences that can be drawn from' those allegations, and, construing the allegations and reasonable inferences 'in the light most favorable to the [plaintiff,]' we determine whether they 'plausibly give rise to an entitlement to relief.'" *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (alterations in original) (citations omitted); *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).

[56] *See generally* ECF 39.

[57] *Id.* at 9.

[58] *Id.* at 11–12.

[59] *Id.* at 8–12.

[60] ECF 60 at 2–5 (using the pagination assigned by the CM/ECF docketing system).

[61] Accredo does not assert a separate argument as to the survival claim.

[62] 27 V.I. Code. Ann. tit. 27, § 166(c).

[63] ECF 39 at 10–11 (using the pagination assigned by the CM/ECF docketing system).

[64] *Id.* at 5 ("VIMMA requires Plaintiff to file a complaint with the Medical Malpractice Review Committee . . . prior to instituting litigation against health care providers, which is exactly what Plaintiff alleges the Accredo Defendants are in pleading the Accredo Defendants are specialty pharmacies licensed to dispense prescription medication.").

[65] ECF 60 at 2–3.

[66] *Id.* at 3–4.

[67] *Id.*

[68] ECF 62 at 4–6 (using the pagination assigned by the CM/ECF docketing system). Accredo seemingly submitted two separate replies at ECF 62 and ECF 63 but as the two briefs appear identical, we cite only to ECF 62.

[69] No. 05-121, 2008 WL 5071681 (D.V.I. Nov. 21, 2008).

[70] *Id.* at *4.

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] 27 V.I. Code. Ann. tit. 27, § 141.

[75] *Id.*

[76] *Id.*

[77] ECF 9 ¶ 19(a)–(c).

[78] ECF 60 at 3–4.

[79] *Id.* at 4.

[80] ECF 9 ¶ 19(a)–(c); 27 V.I. CODE. ANN. tit. 27, § 166(c).

[81] *Walcott*, 2008 WL 5071681, at *3 (citing *Ference v. V.I. Fam. Sports & Fitness Ctr., Inc.*, 45 V.I. 345, 352 (Terr. Ct. 2004)).

[82] 27 V.I. CODE. ANN. tit. 27, § 166(f).

[83] *Id.* § 166(b).

[84] ECF 39 at 10.

[85] *Id.*

[86] *Id.* at 11.

[87] *Id.* at 4–5.

[88] ECF 62 at 7–9.

[89] No. 16-428, 2017 WL 2834091, at *3 (N.D. Ala. June 30, 2017).

[90] 45 V.I. 345.

[91] *Id.* at 353.

[92] *Id.* at 355.

[93] *Id.* at 354 & n.3 (collecting cases).

[94] 2017 WL 2834091, at *3.

[95] *See generally id.*

[96] We note Personal Representative Cariveau's claims for negligence (Count I) and gross negligence (Count II) may also be time-barred because of section 37(a)'s impact on the normal statute of limitations for personal injury. *See infra* note 240. But Accredo, assuming the claim is a medical malpractice claim, does not address the timeliness of the claims in the event we interpret them as claims for ordinary negligence (which we do). We do not make parties' arguments for them, so the negligence claims will proceed subject to further review if timely presented.

---

[97] ECF 37 at 12–18 (using the pagination assigned by the CM/ECF docketing system). Warden Smittie does not move to dismiss so the claims against him remain in the case.

[98] *Id.* at 16–21.

[99] *Id.* at 21–23.

[100] *Id.* at 23–28.

[101] *Id.* at 28.

[102] ECF 57 at 6–27 (using the pagination assigned by the CM/ECF docketing system).

[103] *Id.* at 27–28.

[104] *Id.* at 28–29.

[105] *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

[106] *Id.*

[107] *Clark v. Coupe*, 55 F.4th 167, 179 (3d Cir. 2022) (quoting *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020)).

[108] *Id.* (alterations in original) (quoting *Young v. Martin*, 801 F.3d 172, 177 (3d Cir. 2015)).

[109] *Tillman*, 221 F.3d at 418 (citing *DeShaney v. Winnebago Co. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)).

[110] *Brooks v. Steberger*, No. 23-4535, 2024 WL 1181460, at *5 (E.D. Pa. Mar. 19, 2024) (first citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994); then citing *Moore v. Luffey*, 767 F. App'x 335, 340 n.2 (3d Cir. 2019)).

[111] *Thomas v. City of Harrisburg*, 88 F.4th 275, 281 (3d Cir. 2023) (citing *Natale*, 318 F.3d at 582).

[112] *Id.* (citing *Natale*, 318 F.3d at 582).

[113] *Natale*, 318 F.3d at 582 (second alteration in original) (quoting *Nicini v. Morra*, 212 F.3d 798, 815 n.14 (3d Cir. 2000)).

[114] *Id.* (quoting *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)).

[115] *Payne v. Butts*, No. 22-2210, 2022 WL 16916347, at *1 (3d Cir. Nov. 14, 2022).

---

[116] *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).

[117] *Rode*, 845 F.2d at 1207.

[118] *Id.*

[119] *McCoy v. Scott*, No. 23-21272, 2023 WL 7151361, at *2 (D.N.J. Oct. 31, 2023) (citing *Natale*, 318 F.3d at 583–84).

[120] *Beers-Capitol v. Whetzel*, 256 F.3d 120, 134 (3d Cir. 2001) (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)).

[121] ECF 37 at 11 (first quoting *United States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979); then citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

[122] *Id.* at 12–13.

[123] *Id.* at 13.

[124] *Id.* at 14.

[125] *Id.* at 14–15.

[126] *Id.*

[127] *Id.* at 16–17 (discussing *Goodnight v. Lester*, No. 11-691, 2012 WL 4062814 (W.D. Okla. Sept. 14, 2012)).

[128] *Id.* at 12–17. As noted below, the precise level of Nurse Freeman-Walker's involvement in Mr. Vanausdal's care is unclear, both from the pleadings and from the state actors' Motion to dismiss.

[129] *Id.* at 17.

[130] *Id.*

[131] *Id.* at 17–18.

[132] ECF 57 at 7–13.

[133] *Id.* at 14.

[134] *Id.* at 15–16.

[135] They also repeat many of the arguments from their Motion brief, which we disregard as redundant.

[136] ECF 61 at 8–9 (using the pagination assigned by the CM/ECF docketing system).

[137] *Id.* at 9–10.

[138] Id. at 10–11.

[139] *Id.* at 10.

[140] *Id.* at 17.

[141] ECF 61 at 10.

[142] The District Court of the Virgin Islands, *Local Rules of Civil Procedure*, US COURTS (Apr. 23, 2021), https://www.vid.uscourts.gov/sites/vid/files/local_rules/LocalRulesofCivilProcedure2021.pdf.

[143] No. 21-2168, 2024 WL 2054993 (M.D. Pa. May 8, 2024), *aff'd*, No. 24-2245, 2024 WL 4799473 (3d Cir. Nov. 15, 2024).

[144] *Id.* at *5.

[145] *Id.* at *1 ("The plaintiff . . . is an inmate incarcerated in the Pennsylvania Department of Corrections . . . .").

[146] ECF 61 at 8.

[147] ECF 9 ¶ 41.

[148] *Id.* ¶ 46.

[149] *Id.* Personal Representative Cariveau alleges the cost of the shipment "was quoted to be over $500.00" but he does not allege when Mr. Vanausdal's girlfriend learned of the cost.

[150] *Id.* ¶ 53.

[151] *Id.* ¶ 54.

[152] *Id.* ¶ 55.

[153] ECF 37 at 14 (alteration removed) (quoting *Pearson v. Prison Health Serv.*, 850 F.3d 526, 543 (3d Cir. 2017)).

[154] *See, e.g.*, ECF 9 ¶¶ 143, 179, 215, 251, 287 (alleging "failing to ensure adequate treatment").

[155] *Pearson*, 850 F.3d at 531.

[156] *Id.* at 536.

---

[157] *Id.*

[158] ECF 37 at 15 (quoting *Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir. 2017)).

[159] *Palakovic*, 854 F.3d at 228.

[160] *Id.* at 229, 234.

[161] ECF 37 at 15 (first citing *Est. of Henson v. Krajca*, 440 F. App'x 341, 346 (5th Cir. 2011); then quoting *Bennett v. Virgin Islands*, 25 V.I. 164, 169 (D.V.I. 1990); and then quoting *Roberts v. Spalding*, 783 F.2d 867, 871 (9th Cir. 1986)).

[162] *Krajca*, 440 F. App'x at 345.

[163] *Bennett*, 25 V.I. at 169.

[164] *Id.*

[165] *Roberts*, 783 F.2d at 870–72.

[166] *Id.* at 871.

[167] ECF 37 at 14–15.

[168] ECF 57 at 9–10.

[169] 2012 WL 4062814, at *3–*4.

[170] *Id.* at *2.

[171] *Id.* at *4.

[172] ECF 37 at 17.

[173] *Id.* at 17–18.

[174] *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 318, 324 (3d Cir. 2005) ("Stiles and Graziani immediately initiated CPR on Woloszyn without waiting for a protective mask to arrive."); *Abran v. City of Phila.*, No. 20-3503, 2021 WL 5401542, at *4 (3d Cir. Nov. 18, 2021) ("[T]he record is 'undisputed' that Fearon immediately reported Wilson's condition to medical staff and both Fearon and Cook repeatedly attempted life-saving measures on Wilson.").

[175] *Cooper v. Clancy*, No. 19-362, 2023 WL 2624334, at *1–*2 (N.D.N.Y. Mar. 24, 2023).

[176] *Id.* at *2.

[177] *Id.*

[178] *Id.* at 4.

[179] *Id.* at *5.

[180] ECF 37 at 18.

[181] *Cooper*, 2023 WL 2624334, at *5.

[182] We are also unpersuaded by the state actors' splitting of hairs with regard to the fact Personal Representative Cariveau pleaded the corrections officers were present when Mr. Vanausdal died but argued in his response brief Mr. Vanausdal died "alone." ECF 61 at 17. These are not "alternative facts" which warrant dismissal.

[183] *Rode*, 845 F.2d at 1207; *Beers-Capitol*, 256 F.3d at 134.

[184] ECF 37 at 18.

[185] *Id.* at 20–22.

[186] *Id.* at 22.

[187] ECF 57 at 18.

[188] *Id.* at 20–21.

[189] *Id.* at 21.

[190] ECF 61 at 17–20.

[191] 556 U.S. at 663.

[192] ECF 9 ¶¶ 203–16, 275–88.

[193] ECF 57 at 20.

[194] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

[195] *Id.* at 664.

[196] ECF 9 ¶¶ 193, 265.

[197] *Id.* ¶¶ 87–95.

[198] *Id.* ¶¶ 94–96.

[199] *Id.* ¶¶ 197–201, 269–73.

[200] *Beers-Capitol*, 256 F.3d at 134 (quoting *Sample*, 885 F.2d at 1118).

[201] We need only address qualified immunity with respect to the state actors who remain in this case—Dr. Callwood, Nurse Freeman-Walker, and the corrections officers—not Director Testamark and Governor Bryan.

[202] *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017)).

[203] *Montemuro v. Jim Thorpe Area Sch. Dist.*, 99 F.4th 639, 645 (3d Cir. 2024) (citing *Starnes v. Butler Cnty. Ct. of Common Pleas*, 971 F.3d 416, 426 (3d Cir. 2020)).

[204] *Mack v. Yost*, 63 F.4th 211, 231 (3d Cir. 2023) (quoting *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021)).

[205] *Rivas-Villegas*, 595 U.S. at 5 (quoting *Pauly*, 580 U.S. at 79).

[206] *Mack*, 63 F.4th at 228 (quoting *Jefferson v. Lias*, 21 F.4th 74, 81 (3d Cir. 2021)).

[207] *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)).

[208] *Rivas-Villegas*, 595 U.S. at 5–6 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

[209] *Schneyder v. Smith*, 653 F.3d 313, 330 (3d Cir. 2011).

[210] *Thomas v. Indep. Twp.*, 463 F.3d 285, 291 (3d Cir. 2006) (quoting *Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir. 2001)).

[211] *Id.* at 293.

[212] ECF 37 at 24.

[213] *Id.*

[214] *Id.* at 25.

[215] ECF 57 at 23–27.

[216] ECF 61 at 20–21.

[217] ECF 37 at 24.

---

[218] *Id.* at 23.

[219] ECF 61 at 21.

[220] *See infra* Part II(B)(1).

[221] *Tressler v. Ctr. Cnty.*, No. 24-456, 2024 WL 4989315, at *13 (M.D. Pa. Dec. 5, 2024) (quoting *Rossman v. PrimeCare Med. Inc.*, No. 21-703, 2022 WL 1019991, at *5 (M.D. Pa. Apr. 5, 2022)).

[222] *See, e.g.*, *Kinney v. Cnty. of Berks*, No. 22-2566, 2023 WL 3868379, at *8 (E.D. Pa. June 6, 2023) ("The Third Circuit has enumerated examples of deliberate indifference, 'including where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, and (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs.'" (quoting *Pearson*, 850 F.3d at 538)). "The Third Circuit has also said 'prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for "an easier or less efficacious treatment" of the inmate's condition.'" *Id.* (quoting *Palakovic*, 854 F.3d at 228).

[223] 27 V.I. CODE. ANN. tit. 5, § 77.

[224] *See id.*

[225] *Id.* § 31(a)(5)(A).

[226] *Id.* § 37(a).

[227] ECF 37 at 30 (quoting *Der Weer v. Hess Oil Virgin Island Corp.*, 61 V.I. 87, 116 (Super. Ct. 2014), *as corrected* (Dec. 23, 2014)).

[228] ECF 57 at 28 (first citing *Martinez v. Hess Oil Virgin Islands Corp.*, 69 V.I. 519, 541 (Super. Ct. 2018); then citing *Ramos v. Abramson Enters., Inc.*, 43 V.I. 11, 13 (Terr. Ct. 2000)).

[229] *Id.* at 29.

[230] EF 61 at 4 (discussing *Jeremiah v. Virgin Islands Dep't of Hum. Servs.*, 77 V.I. 310, 317–18 (Super. Ct. 2023)).

[231] *Id.* at 5.

[232] *Der Weer*, 61 V.I. at 116 (citing 5 V.I.C. § 31(a)(5)(A)).

[233] *Id.*

[234] *Id.*

[235] *Id.*

[236] *Id.*

[237] *Id.*

[238] *Jeremiah*, 77 V.I. at 317–18.

[239] *Martinez*, 69 V.I. at 541.

[240] *Ramos*, 43 V.I. at 12–14.

[241] Dismissing the survival claim has no real impact on the case because "a survival claim is not really a claim. It is merely a vehicle for pursuing someone else's claims." *Der Weer*, 61 V.I. at 103. But this begs the question of how dismissing the survival claim might impact Personal Representative Cariveau's remaining section 1983 claims. Our Court of Appeals follows "the general rule that 'a litigant may only assert his own constitutional rights or immunities,' and the principle that 'one cannot sue for the deprivation of another's civil rights.'" *O'Malley v. Brierley*, 477 F.2d 785, 789 (3d Cir. 1973) (first quoting *United States v. Raines*, 362 U.S. 17, 22 (1960) and *McGowan v. State of Md.*, 366 U.S. 420, 429 (1961); then citing C. Antieau, Federal Civil Rights Acts: Civil Practice § 31 (1971)).

So, Personal Representative Cariveau may only assert constitutional claims on Mr. Vanausdal's behalf through the mechanism of the Virgin Islands' survival statute. This raises an issue concerning the statute of limitations on Personal Representative Cariveau's section 1983 claims. "Virgin Islands law governs the length of the limitations period for a § 1983 claim . . . ." *Lockhart-Mollah v. Gov't of Virgin Islands*, No. 05-126, 2009 WL 2407825, at *3 (D.V.I. July 31, 2009) (citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). "The Virgin Islands' two-year statute of limitations applicable to personal injuries, 5 V.I.C. § 31(5)(A), governs the length of the limitations period." *Id.* (citing *Callwood v. Questel*, 883 F.2d 272, 274 (3d Cir. 1989)). But, as we noted above, the state actors correctly argue section 37(a) of the Virgin Islands Code decreases the statute of limitations for personal injuries brought by a personal representative on behalf of a decedent to one year after the decedent's death. It seemingly follows the one-year statute of limitations on the survival claim would govern Personal Representative Cariveau's section 1983 claims as well. But the state actors do not move to dismiss the section 1983 claims as untimely so we will not decide issues not presented to us.

Section 37(a)'s "shrinking" effect on the normal statute of limitations for a personal injury claim is also possibly applicable to the negligence claims against Accredo, but Accredo, like the state actors, does not raise the argument. Accredo's timeliness arguments focus entirely on the Virgin Islands Medical Malpractice Act because Accredo assumes Personal Representative Cariveau's negligence claims are actually medical malpractice claims. ECF 39 at 12–14; ECF 62 at 13–14. It does not raise the alternative possibility the claims are untimely even if they are claims for ordinary negligence because section 37(a) modifies the time to bring a negligence claim to one year from the death of the person on whose behalf the negligence claim is being brought. *See, e.g.*, *Jeremiah*, 77 V.I. at 318 ("As such, due to Plaintiff's failure to file the complaint for the survival claim within

one year of the decedent's date of death as required under Title 5 V.I.C. § 37(a), Plaintiff's negligence claim must be dismissed for failure to state a claim upon which relief may be granted." (citing *Der Weer v. Hess Oil V.I. Corp.*, 64 V.I. 107, 123 (Super. Ct. March 15, 2016))).

[242] ECF 57 at 29.

[243] A proposed amended complaint is futile if it fails to state a claim upon which relief can be granted or if the claims cannot overcome the statute of limitations. *See Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000); *Anderson v. Bondex Int'l, Inc.*, 552 F. App'x 153, 156 (3d Cir. 2014). Where the statute of limitations bars a claim, we only permit amendment "if the proposed amended complaint 'relates back' to the date of the original pleading" under Rule 15(c). *Anderson*, 552 F. App'x at 156. "[I]n order to benefit from Rule 15(c)'s relation back doctrine, the original complaint must have been timely filed." *Der Weer*, 61 V.I. at 115 (alteration in original) (quoting *Henderson v. Bolanda*, 253 F.3d 928, 931 (7th Cir. 2001)). "An amended complaint does not relate back to the filing of the original complaint if the original complaint, itself, was filed after the expiration of the statute of limitations." *Id.* (quoting *Henderson*, 253 F.3d at 931). Permitting Personal Representative Cariveau to amend his Complaint again would be futile as to the survival claim because it is time-barred and cannot relate back under Rule 15(c) given Personal Representative Cariveau brought his original survival claim outside the statute of limitations.