**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN**

**CASE NO. 3:24-cv-00029**

**TOM CARIVEAU, As Personal Representative of the Estate of Craig Vanausdal, Deceased, and on behalf of decedent's beneficiaries,**

**Plaintiff,**

**v.**

**ACCREDO HEALTH GROUP, INC., a Foreign Corporation, et al.**
**___________________________________________/**

## FOURTH AMENDED COMPLAINT FOR DAMAGES

COMES NOW, the Plaintiff, TOM CARIVEAU, as Personal Representative of the Estate of CRAIG VANAUSDAL, Deceased, by and through undersigned counsel, and files this lawsuit against ACCREDO HEALTH GROUP, INC., and WYNNIE TESTAMARK, in her individual capacity, and states:

### JURISDICTION AND VENUE

1. This is a civil action seeking damages in excess of $75,000.00 USD, exclusive of costs, interest, and attorneys' fees and provides this Court with jurisdiction over this matter pursuant to 28 U.S.C. §1332 as the amount exceeds $75,000 exclusive of interest and costs and this is an action in which Plaintiffs and Defendants are citizens of different states.

2. The predominant counts in this action arise under the Constitution and laws of the United States of America and thus invoke this Court's original jurisdiction over federal questions pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, 42 U.S.C. § 1983, and 42 U.S.C. § 1988.

3. The remaining counts in this action arise under the common law or laws of the United States Virgin Islands and are so related to those claims for which this Court has original jurisdiction that they form part of the same case or controversy under Article III of the United

States Constitution and thus invoke this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

4. Venue is proper. 28 U.S.C. § 1391. The Individual Defendants principal addresses are in St. Thomas, United States Virgin Islands, and all defendants are residents of such and the tortious acts that resulted in the death of the Decedent, Craig Vanausdal, substantially occurred in this district

## PARTIES

5. The Plaintiff, TOM CARIVEAU As Personal Representative of the Estate of Craig Vanausdal, Deceased, (hereinafter "Plaintiff") and on behalf of decedent's beneficiaries, bears an address of P.O. Box 1260, Lakeport, CA 95453, is a citizen and resident of the State of California, is domiciled therein and is otherwise *sui juris*.

6. The Defendant, ACCREDO HEALTH GROUP, INC., is a foreign corporation, organized under the laws of Delaware with its principal place of business located in St. Louis, MO.

7. The Defendant, WYNNIE TESTAMARK (hereinafter "TESTAMARK"), is an individual who is and was, at all times material, the Director of the Virgin Islands Bureau of Corrections (hereinafter "VI BOC"), is a citizen and resident of the Territory of the United States Virgin Islands, is domiciled therein and is otherwise *sui juris*..

## WRONGFUL DEATH BENEFICIARIES

8. Pursuant to 5 V.I.C. §76(e), the following are potential beneficiaries of a recovery for wrongful death of the Decedent, Craig Vanausdal:

a. Surviving Mother – Roseanna Lanciano;

b. Estate of Craig Vanausdal.

9. Pursuant to 5 V.I.C. §76(e)(4), surviving Mother, Roseanna Lanciano, may

recovery for her mental pain and suffering from the date of death.

10. Pursuant to 5 V.I.C. §76(e)(6), the Estate of Craig Vanausdal, through the Plaintiff, may recover for the loss of net accumulations of the Estate from the time of injury through the time of death, and any associated medical and/or funeral expenses incurred and owed by the Estate.

## PERSONAL JURISDICTION OF FOREIGN CORPORATIONS

11. This Court is authorized to exercise personal jurisdiction over ACCREDO HEALTH GROUP, INC. (hereinafter "ACCREDO") pursuant to Virgin Islands Long-Arm Statute 5 V.I.C. §4903(a)(1) and (a)(4), because the claims stated herein arise out of ACCREDO HEALTH GROUP, INC.:

a. Transacting business in this territory; and

b. Causing tortious injury in this territory by an act or omission outside this territory as he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this territory.

12. This Court is further authorized to exercise personal jurisdiction over ACCREDO HEALTH GROUP, INC. because they have the following sufficient minimum contacts with the Territory of the Virgin Islands:

a. Upon information and belief, ACCREDO HEALTH GROUP, INC., received a license from the applicable Governmental agency to sell and deliver medicine to customer in the Territory of the Virgin Islands

b. They all knowingly, purposely, and intentionally sold and shipped prescription medication to the Virgin Islands to be used by the residents.

## FACTS APPLICABLE TO ALL COUNTS

13. The St. Thomas Jail is a correctional facility intended to *inter alia* detain people who are accused of violating criminal laws of the United States Virgin Islands, within the jurisdiction of St. Thomas.

14. On or about May 4, 2022, while still in the Unites States Virgin Islands for work, Plaintiff, Craig Vanausdal, deceased, was at the Cyril E. King Airport, located in St. Thomas, USVI, attempting to return home, when he was arrested by agents of the US Customs Officers and/or USVI Police Department, on suspicion of an outstanding warrant from an alleged 2004 marijuana arrest, in violation of the criminal laws of the Commonwealth of Pennsylvania.

15. Following his arrest, Plaintiff, Craig Vanausdal, deceased, was brought to the USVI Bureau of Corrections Jail Facility in St. Thomas as a pretrial detainee.

16. On or about May 5, 2022, during Plaintiff's, Craig Vanausdal, deceased, initial classification, in response to the prompt, "Do you have any mental, physical, or developmental disabilities or limitations that we need to know about during your incarceration?" Craig Vanausdal, deceased, indicated that he was a hemophiliac, and must take his medication otherwise he could die.

17. Hemophilia A is an X-linked, recessive disorder caused by deficiency of functional plasma clotting factor VIII (FVIII), which may be inherited or arise from spontaneous mutation. Hemophilia A is the most common X-linked genetic disease and the second most common factor deficiency after von Willebrand disease(vWD). Approximately 50-60% of patients have severe hemophilia A (FVIII $<$ 2% of normal), associated with the severest bleeding manifestations.

18. Since this is the most common form and most well-known form of hemophilia, the Defendant should have been well aware of this condition, its morbidly and mortality, its clinical presentation, and its treatment.

19. Morbidity and death related to Hemophilia A are primarily the result of hemorrhage.

20. The treatment of hemophilia may involve prophylaxis medication and management of bleeding episodes.

21. On or about May 5, 2022, at the 1326 intake screening, the Defendants were advised on the hemophilia, medication that he was taking, the frequency that he was taking it and when it was last taken, which was the prophylaxis medication necessary to control the Hemophilia A and prevent morbidity and death.

22. On or about May 5, 2022, at 1348, Craig Vanausal, deceased, executed a medical authorization for the BOC to have access and to get all the medical information.

23. On or about May 8, 2022, photographs were taken of the prescription medication that Craig Vanausdal, deceased, was taking with the labels attached.

24. Being as though Craig Vanausdal, deceased, was traveling back to his home located in the United State of America, he did not have excess medication on his person and/or contained in his luggage, as he anticipated taking his medication upon arrival at his home.

25. On or about May 9, 2022, at 1009 Dr. Linda Callwood took a history and physical, noted Hemophilia and medication usage with a schedule of Monday/Wednesday/Friday dosing of Recombinant medication.

26. Craig Vanausdal did additional doses of the medication that could have been used. However, the medication was expired, and Dr. Callwood made the decision to discard the lifesaving medication, despite not having any medication available on the island as a substitute.

27. Due to the withholding, lack of provision and/or absence of proper medication for Plaintiff, he suffered from the following, including, and not limited to deep bruising, joint pain and

swelling, unexplained and uncontrolled bleeding, while experiencing blood in both his urine and stool, alone and scared for his life in the St. Thomas Jail cell.

28. From the afternoon of May 4, 2022, until the morning of May 16, 2022, Plaintiff, Craig Vanausdal, deceased, suffered daily from the lack of medication, and went over 12 days without his medication before he was tragically found dead in his cell on May 16, 2022.

29. On or about May 9, 2022, at 1306 Craig Vanausdal, deceased complained of right ankle pain due to him not getting his medicine. Later Nurse Velma Freeman-Walter noted his ankle was swollen and painful to the touch – indicative of bleeding in the ankle. Given these findings, coupled with his Hemophilia A diagnosis, he should have been taken to the Emergency Department at the nearby hospital.

30. On or about May 9, 2022, Dr. Callwood had a phone conference with Taylor Hayes the girlfriend of Craig Vanausdal, deceased, to find out his provider back home.

31. On or about May 9, 2022, Dr. Callwood also alleges to have had a phone conversation with Dr. Ethan Schram, who was Craig Vanausdal, deceased, treating doctor in California. DR. Callwood was made aware that the Mr. Vanausdal was prescribed Recombinant 3000 units to infuse daily (mixed with 5 ml sterile water and injected slowly at 5 ml over 1 minutes). Upon information and belief, he also made her aware of the life-threatening position Craig Vanausdal, deceased, would be in without the prescribed medication.

32. On or about May 9, 2022, DR. Callwood contacted the local pharmacy on island, but the medication can only be obtained from special pharmacy.

33. She attempted to contact ACCREDO, who were responsible for providing and supplying Craig Vanausdal's hemophilia medication and made them aware of Mr. Vanausdal's urgent need for the medication to be shipped overnight to the U.S. Virgin Islands.

34. They advised DR. Callwood, that they mailed a 12-dose prescription to Craig Vanausdal's home address at the time on May 3, 2022 and they informed her that they would not be sending the life-saving medication.

35. Craig Vanausdal's girlfriend, Taylor Hayes, also contacted ACCREDO and informed them of the urgent need for decedent's hemophilia medication to be shipped overnight to the U.S. Virgin Islands.

36. Despite these notifications and the ACCREDO's knowledge of decedent's life-threatening situation, ACCREDO failed to ship decedent's hemophilia medications to the U.S. Virgin Islands as requested.

37. Despite being informed of decedent's life-threatening situation, ACCREDO took no action to ensure that decedent's medications were made available to Dr. CALLWOOD and/or U.S. Virgin Islands authorities in the U.S. Virgin Islands

38. At that point, Dr. CALLWOOD was aware that Craig Vanausdal, deceased had his last dose of medication on May 2, 2022, and was not capable of providing it to him, now a week later.

39. On or about May 9, 2022, DR. Callwood spoke with Taylor Hayes and told her to overnight the medication. No offer was made to cover the expense of the shipment, which was quoted to be over $500.00. Additionally, there was a customs fee, which was the only thing that VI BOC was willing to pay for.

40. On or about May 10, 2022, Craig Vanausdal, deceased, put in a sick call request noting to be having difficulty sleeping secondary to pain and reported starting a bleed in his right elbow. Given this reporting, coupled with his Hemophilia A diagnosis, he should have been taken to the Emergency Department at the nearby hospital.

41. On or about May 11, 2022, Craig Vanausdal, deceased, complained of right elbow pain, which demonstrated that the bleeding was progressing and was assessed by Defendant FREEMAN-WALTER at 1503. Given these findings, coupled with his Hemophilia A diagnosis, he should have been taken to the Emergency Department at the nearby hospital.

42. On May 11, 2022, a Consultation Form was completed by DR. Callwood and Nurse Freeman-Walter to have Craig Vanausdal, deceased examined at Caribbean Hematology & Oncology Center, LLC.

43. Craig Vanausdal, deceased, was not able to attend the appointment at Caribbean Hematology & Oncology Center, LLC as the facility was understaffed and correction staff was already with another inmate at an appointment.

44. However, Dr. Callwood was able to speak with Dr. Bachan, the hematologist at Caribbean Hematology & Oncology Center, LLC, who informed her that the treatment for Craig Vanausdal, deceased, was not available on island.

45. On or about May 12, 2022, at 1130, Defendant DR. Callwood placed a call to Sergeant Huzzard with the PA Sheriff Department concerning the need for Craig Vanausdal, deceased, immediate transfer due to the inability to treat his Hemophilia A.

46. On or about May 12, 2022, at 1420, Defendant Dr. Callwood was contacted by Accredo Specialty Pharmacy concerning the call received from Ms. Hayes that she was unable to ship the medication due to costs.

47. On or about May 13, 2022, Defendant Nurse Freeman-Walter was informed by Acredo Pharmacy that the medication was being sent via FedEx, although the listed tracking number in the medical records is not found when searching for the package.

48. On or about May 13, 2022, Defendant DR. Callwood was informed that Judge Tejo,

Superior Court Judge for the Virgin Islands, would not be able to hear the case until Monday May 16, 2022.

49. Defendant TESTAMARK was directly involved in the decision-making process for the care and treatment of Craig Vanausdal and was informed by Dr. Callwood as to Mr. Vanausdal's condition, the lack of medication and the need to get him additional medical care.

50. No urgency between the dates of May 4, 2022, and May 13, 2022, to get Mr. Vanausdal out of custody and/or to send him to the hospital was made by the Defendants, despite the direct knowledge that they could not provide appropriate treatment for his severe Hemophilia A condition that was life threatening, especially in light of his bleeding symptoms.

51. On or about May 14, 2022, Craig Vanausdal, deceased, had an elevated heart rate or "tachycardia", which is a systemic sign of hemorrhage. This necessitated the taking of Craig Vanausdal, deceased, to the emergency room at the nearby hospital.

52. On or about May 14, 2022, Craig Vanausdal, deceased, complaint of increased pain and bleeding into his elbow with new bruises and that it was "too painful to walk." Given these findings, coupled with his Hemophilia A diagnosis, he should have been taken to the Emergency Department at the nearby hospital.

53. Craig Vanausdal, deceased, was also showing Organ system signs of hemorrhage including the following:

a. Musculoskeletal (joints) - Tenderness, pain with movement, decreased range of motion, effusion, and warmth - present in his right ankle; then elbow; and then body

b. Gastrointestinal (GI) - complained of diarrhea early on

c. Other - Hematoma leading to location-specific signs – had noted bleeding at other sites all over the body on May 14, 2022.

54. The Defendants had been made aware of the severe Hemophilia A, which meant that Craig Vanausdal, deceased, was prone to spontaneous bleeds. When he self-identified the signs and symptoms of bleeding into his joints (first his ankle and then his elbow) he notified them, and they simply did nothing, in direct contradiction of his constitution right to proper medical care.

55. On or about May 15, 2022, at 830, Craig Vanausdal, deceased, was only able to walk to the door with crutches. Despite the continuing deterioration of his symptoms, the lack of provision of his life-saving medication and the risk of death, Mr. Vanausdal was never taken to the hospital for proper workup and potentially life flight off island, which is well within the purview of the medical staff of the VI BOC.

56. On or about May 16, 2022, at 0358, less than 24 hours later from the examination the day prior a call was received by Virgin Islands EMS. They arrived at the St. Thomas Jail and were at the patient at 0417 and found Craig Vanausdal "shirtless on the floor, unresponsive to any stimulus, apneic, pulseless, and cold to the touch with fixated pupils." He was pronounced dead at the scene.

57. ACCREDO failed to apply and ensure delivery of decedent's hemophilia medication prior to May 16, 2022, which would have prevented the premature and tragic death of Craig Vanausdal, while in custody at St. Thomas jail facility.

58. At all times material hereto, ACCREDO knew or should have known that their failure to provide the necessary prescription medication could and would lead to a dangerous condition, including, but not limited to, death.

59. ACCREDO knew or should have known that the failure and/or refusal to distribute decedent's prescription medications to treat his hemophilia could in result in bleeding and/or death.

60. As a direct and causal result of the negligent and liability inducing conduct of

ACCREDO stated herein, decedent was caused to suffer severe and permanent injuries, including death as set forth herein

61. For a period of time between May 4, 2022, until the morning of May 16, 2022, the Individual Defendants, had a responsibility and/or duty to Plaintiff, Craig Vanausdal, deceased, to properly process him in accordance with the USVI and St. Thomas Jail facilities procedure, including but not limited to, keeping him alive and being cognizant of any and all medical conditions of their detainees and/or inmates.

62. For a period of time between May 4, 2022, until the morning of May 16, 2022, the Individual Defendants, omitted the distribution of the above-mentioned hemophilia medication, which would have prevented the premature and tragic death of Plaintiff, while in custody at Defendant's St. Thomas Jail facility.

63. At all times relevant hereto, the employees and agents of the Individual Defendants, were responsible for filling, distributing and or administering the prescription medication referenced above, needed to treat Plaintiff's Hemophilia.

64. For a period between May 4, 2022, until the morning of May 16, 2022, the Individual Defendants, withheld the Hemophilia medication, failed to properly fill, distribute, or administer said medication, all leading to the unfortunate, untimely death of Plaintiff.

65. As a result of Plaintiff, Craig Vanausdal, deceased, not being provided the necessary prescription dosage of his Hemophilia medication, Plaintiff suffered exsanguination, and bled out, which resulted in his tragic, untimely death.

66. The aforesaid conduct was caused by the gross negligence, carelessness, indifference, and recklessness of the Defendants, and was in no matter due to any act or failure to act on part of the Plaintiff.

67. At all times relevant hereto, the Individual Defendants knew or should have known that failure to provide the necessary prescription medication could and would lead to a dangerous condition, including, but not limited to, death.

68. The Defendants knew or should have known that the omission, withholding and/or refusal to distribute the prescription medication used to treat Hemophilia would result in advanced exsanguination and/or death.

69. The Defendants knew or should have known that the absence of the prescription medication used to treat Hemophilia is dangerous for Plaintiff's health and wellbeing.

70. The Defendants knew or should have known that the omission of the prescription medication used to treat Hemophilia for a patient with Hemophiliac's disease, namely Plaintiff Craig Vanausdal, could result in danger and/or death.

71. The Defendants acted in deviation from accepted standards of care and such conduct was a substantial factor in bringing about harm and/or death to the Plaintiff.

72. These Defendants had actual and/or constructive notice of the facts previously alleged, and facts set forth hereinafter.

73. As a direct and causal result of the negligent and liability inducing conduct of the Defendants as stated herein, Plaintiff was caused to suffer severe and permanent injuries, including death, as set forth herein.

## FEDERAL OVERSIGHT OF THE VIRGIN ISLANDS JAIL FACILITIES

74. Based on information and belief, the Jail Facilities on St. Croix and St. Thomas have long been under the supervision by the Federal Courts due to the neglectful way the inmates were housed, including, *inter alia*, issues with proper facilities and access to appropriate medical care.

75. Based on information and belief, the jail facilities on St. Croix have been under supervision since 1986 and the jail facilities on St. Thomas have been under similar oversight since 1994.

76. Both the facilities are under federal consent decrees that required court-ordered monitoring and oversight at the facilities, which they have long struggled to provide constitutional standards of confinement.

77. In 2013, the Settlement Agreement between the GOVERNMENT OF THE VIRGIN ISLANDS and VIRGIN ISLANDS BUREAU OF CORRECTIONS and the ACLU, attached hereto as Exhibit "A," was approved by the Court.

78. As applicable here, Section V entitled "Medical and Mental Health Care" required "timely access to and provision of adequate medical and mental health care for chronic and acute conditions." Exhibit A, Sec. V.(2)(e).

79. Additionally, the Settlement Agreement requires the, "[c]ontinuity, administration and management of medications that address: […]

ii. Continuity of medications for newly-admitted prisoners.

iii. medication administration practices that comply with applicable professional standards. Exhibit A, Sec. V.(2)(f)(ii) and (iii).

80. Additionally, the Settlement Agreement provides that the Defendants were to retain, "a physician board certified in internal medicine, family medicine, or emergency medicine for at least two (2) hours daily to conduct intake screenings and physical exams, sick call and medical assessments and follow-up exams." Exhibit A, Sec. V.(2)(m)(v).

81. In addition to one on site for 2 hours per day, one needed to be on call "at all times when one is not physically present at the facility." Exhibit A, Sec. V.(2)(m)(vi).

82. Based on information and belief, as of 2022, the time with which the Decedent, Craig Vanausdal was incarnated at the St. Thomas Jail Facility, the Virgin Islands Bureau of Corrections has yet to fully comply with the federal consent decree.

## COUNT I – NEGLIGENCE
*(AS TO DEFENDANT, ACCREDO HEALTH GROUP, INC)*

83. PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-82.

84. At all times relevant hereto, ACCREDO had a duty of providing, supplying, and/or delivering decedent's hemophilia medications.

85. Defendants breached that duty in one or more of the following respects:

a. Failing to supply and/or deliver descendant's hemophilia medication to his location in the U.S. Virgin Islands;

b. Failing to ensure decedent's prescription medications were delivered to the U.S. Virgin Islands;

c. Failing to take any all steps necessary to ensure that decedent's hemophilia medications were delivered to the U.S. Virgin Islands in a timely manner when informed of his life-threatening situation;

d. Failing to take necessary action to ensure provision of decedent's hemophilia medication when advised of decedent's life-threatening situation by Dr. CALLWOOD;

e. Improperly delaying shipment of decedent's prescription medication despite knowledge of his life-threatening situation;

f. Failing to assist descendant's physicians, including Dr. CALLWOOD, in securing immediate access to decedent's prescription medications and;

g. Failing to act as a reasonably prudent company under similar circumstances.

86. Each and all of these acts and omissions, taken alone or in combination, were proximate cause of the injuries and the damages and death of the descendant.

87. At all pertinent times, defendants knew or should have known the failure to act greatly increased the risk of harm to the decedent including the risk of death.

88. As a direct and proximate result of defendant's conduct, Plaintiffs incurred both economic and non-economic damages including but not limited to physical and mental pain and suffering, emotional distress, loss of enjoyment, impairment of quality of life, loss of earning and earning capacity and death.

89. Furthermore, as a direct and proximate result of the negligence noted above, Craig Vanausdal was denied his life-saving medication, resulting in his death, which caused damages his Estate and to his surviving mother pursuant to 5 V.I.C. §76, for which the Defendant is liable.

**COUNT II – GROSS NEGLIGENCE**
*(AS TO DEFENDANT, ACCREDO HEALTH GROUP, INC.,)*

90. PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-89 .

91. ACCREDO committed malice, oppression and reckless indifference to the life and safety of decedent, Craig Vanausdal.

92. ACCREDO is a specialty pharmacy that works with difficult medical conditions, and it knows of the life-threatening situations if the medication is not received by its patients, such as the Decedent.

93. ACCREDO exhibited willful, knowing and cruel disregard for the life and safety of Craig Vanausdal by failing to ensure delivery of his hemophilia medication despite their knowledge of his life-threatening situation.

94. ACCREDO's conduct constituting malice, oppression and reckless indifference to the life and safety of Craig Vanausdal was committed by, authorized by, and adopted by one or more employee's, officers, directors, and/or agents within the corporate hierarchy of the

defendants who acted on defendant's behalf.

95. Punitive and/or exemplary damages are warranted to the extent permitted under Virgin Islands Law and/or other applicable law for the wanton, willful, reckless, and indifferent acts of the defendants who demonstrated complete disregard and reckless indifference for the safety and welfare of decedent, and are claimed in an amount sufficient to punish ACCREDO and deter future similar conduct.

**COUNT III – DELIBERATE INDIFFERENCE REGARDING VANAUSDAL'S SERIOUS MEDICAL NEEDS TO AMBULATORY, EMERGENCY, SPECIALTY, AND OUTSIDE SERVICES**
*(AS TO DEFENDANT, WYNNIE TESTAMARK, IN HER INDIVIDUAL CAPACITY)*

96. PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-82.

97. The provision of health care and services to pretrial detainees within a State or municipality's jail or correctional facility, such as Craig Vanausdal within the St. Thomas Jail, is a governmental act.

98. At all times material, by virtue of the USVI St. Thomas Jail Rules, Policies & Procedures, the Government of the US Virgin Islands and the VI BOC, regulated and substantially funded St. Thomas Jail to perform the governmental act of providing health care services to pretrial detainees within the St. Thomas Jail, including Craig Vanausdal.

99. At all times material, the Government of the US Virgin Islands and the VI BOC and its employees worked in concert and jointly participated in the enterprise of operating the St. Thomas Jail and providing health and services to pretrial detainees within the St. Thomas County Jail, including Craig Vanausdal.

100. At all times material, the Government of the US Virgin Islands and the VI BOC and its employees closely cooperated and coordinated their respective efforts to operate the St.

Thomas Jail and provide health care and services to pretrial detainees within the St. Thomas Jail, including Craig Vanausdal.

101. As such, at all times material, the Government of the US Virgin Islands and the VI BOC and its employees, DIRECTOR TESTAMARK, were acting under the color of state law.

102. At all times material, Plaintiff was deprived of rights (to wit: sufficient and adequate health care as a pretrial detainee) secured by the Constitution or laws of the United States, including, but not limited to, the Fourteenth Amendment to the United States Constitution and Title 42 of the United States Code.

103. At all times material, by virtue of the USVI St. Thomas Jail Facility Rules, Regulations, Policies & Procedures, they were required to provide "all medical, dental, mental health, substance abuse and other related health care services," excluding non-emergency transportation by EMS, to residents of the St. Thomas Jail, including pretrial detainees such as Plaintiff.

104. At all times material, by virtue of the 2013 Settlement Agreement (Exhibit A) they were required to provide, *inter alia*, "timely access to and provision of adequate medical and mental health care for chronic and acute conditions" and "continuity of medications for newly-admitted prisoners."

105. DIRECTOR TESTAMARK, at the time of the wrongful detention of Craig Vanausdal, was the director for the VI BOC and responsible for all actions, including medical care at the St. Thomas Jail for inmates, including Craig Vanausdal.

106. Upon information and belief, TESTAMARK was made aware of complicated medical cases within the St. Thomas Jail Facility, as was the case with Craig Vanausdal directly by Dr. Callwood and Nurse Freeman-Walter.

107. Upon information and belief, at all times material, by virtue of its own policies and the 2013 Settlement Agreement, the Government of the US Virgin Islands and VI BOC had a duty to, *inter alia*, give residents of the St. Thomas Jail, including Craig Vanausdal, access to care; prohibit unreasonable barriers to care; receive care based on need, without regard to financial status; receive equal access to health services even if, as a result of some condition, they could not speak; receive timely administration and continuation of medications for inmates; receive timely laboratory and diagnostic services; have access to hospitalization and/or specialty care; be brought to a community hospital if health care needs were beyond the resources available in the St. Thomas Jail; if suffering from a life-threatening condition, to have EMS and 911 activated immediately; and receive medically necessary care.

108. Upon information and belief, DIRECTOR TESTAMARK was actual or constructive knowledge of the obligations under the 2013 Settlement Agreement for the provision of constitutionally provided medical care to pretrial detainees, such as Craig Vanausdal, at the St. Thomas Jail facility.

109. Based on information and belief, prior to and throughout Craig Vanausdal's detention in the St. Thomas Jail, the Government of the US Virgin Islands and VI BOC had a longstanding and widespread (that is, not just limited to the St. Thomas Jail) practice of failing to transport residents at jails and prisons in need of outside medical services to outside facilities such as urgent cares, emergency rooms, and hospitals; or, if transporting such residents to outside facilities, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

110. Based on information and belief, prior to and throughout Craig Vanausdal's detention in the St. Thomas Jail, the Government of the US Virgin Islands and VI BOC had a

longstanding and widespread (that is, not just limited to the St. Thomas Jail) practice of failing to have adequate medication for new inmates; or, if such medication was unavailable, it was not obtained within a reasonable time or with deliberate indifference to the resident's medical needs.

111. Based on information and belief, prior to and throughout Craig Vanausdal's detention in the St. Thomas Jail, the Government of the US Virgin Islands and VI BOC had a longstanding and widespread (that is, not just limited to St. Thomas Jail) practice of failing to activate EMS and/or 911 and/or Fire Rescue and/or ambulance services for the benefit of residents at jails and prisons in need; or, if activating such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

112. Based on information and belief, prior to and throughout Craig Vanausdal's detention in the St. Thomas Jail, the Government of the US Virgin Islands and VI BOC had a longstanding and widespread (that is, not just limited to St. Thomas Jail) practice of failing to provide or arrange for specialty medical services for the benefit of residents at jails and prisons in need; or, if providing or arranging such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

113. DIRECTOR TESTAMARK had actual or constructive knowledge of the longstanding and widespread practices referenced herein.

114. The considerations set forth in this count places residents at the St. Thomas Jail, including Craig Vanausdal, at risk of not receiving proper medication, the ambulatory, emergency, specialty, and/or off-site medical services they needed; serious medical needs that DR. CALLWOOD knew of and exhibited a deliberate indifference to.

115. On or about May 5, 2022, upon information and belief, DIRECTOR TESTAMARK knew or should have known that Craig Vanausdal had Hemophilia A, which was a common and

serious condition, and that VI BOC did not have any additional medication to treat his life-threatening condition.

116. On or about May 9, 2022, upon information and belief, DR. Callwood discarded medication that Craig Vanausdal had because it was "expired" without giving him the opportunity to decide whether he wanted to take it, knowing that there was no medication on island as a substitute, and knowing that he had his last dose on May 2, 2022 (where he was required to take Monday/Wednesday/Friday).

117. On or about May 9, 2022, upon information and belief, DIRECTOR TESTAMARKknew that Craig Vanausdal needed this life saving medication and was deliberately indifferent to those needs.

118. On or about May 9, 2022, upon information and belief, DIRECTOR TESTAMARK knew that Craig Vanausdal needed emergency, ambulance, and/or urgent care to an outside facility beyond St. Thomas Jail because the medical staff and/or equipment in the St. Thomas Jail was inadequate to reasonably care for Craig Vanausdal and was deliberately indifferent to those needs.

119. On or about May 10, 2022, upon information and belief, DIRECTOR TESTAMARK knew that Craig Vanausdal's condition was worsening with continuing bleeding, that he needed the lifesaving medication and was deliberately indifferent to those needs.

120. On or about May 10, 2022, upon information and belief, DIRECTOR TESTAMARK knew that Craig Vanausdal needed emergency, ambulance, and/or urgent care to an outside facility beyond St. Thomas Jail because the medical staff and/or equipment in the St. Thomas Jail was inadequate to reasonably care for Craig Vanausdal and was deliberately indifferent to those needs.

121. On or about May 13, 2022, upon information and belief, DIRECTOR

TESTAMARK knew that Craig Vanausdal's condition was worsening with continuing bleeding, that he needed the lifesaving medication and was deliberately indifferent to those needs.

122. On or about May 13, 2022, upon information and belief, DIRECTOR TESTAMARK knew that Craig Vanausdal needed emergency, ambulance, and/or urgent care to an outside facility beyond St. Thomas Jail because the medical staff and/or equipment in the St. Thomas Jail was inadequate to reasonably care for Craig Vanausdal and was deliberately indifferent to those needs.

123. On or about May 14, 2022, upon information and belief, DIRECTOR TESTAMARK knew that Craig Vanausdal's condition was worsening with continuing bleeding, elevated heart rate, gastrointestinal issues, and increased pain, and that he needed the lifesaving medication and was deliberately indifferent to those needs.

124. On or about May 14, 2022, upon information and belief, DIRECTOR TESTAMARK knew that Craig Vanausdal needed emergency, ambulance, and/or urgent care to an outside facility beyond St. Thomas Jail because the medical staff and/or equipment in the St. Thomas Jail was inadequate to reasonably care for Craig Vanausdal and was deliberately indifferent to those needs.

125. On or about May 14, 2022, upon information and belief, DIRECTOR TESTAMARK knew that Craig Vanausdal's condition was worsening with continuing bleeding, elevated heart rate, gastrointestinal issues, increased pain, and inability to walk without using crutches, and that he needed the lifesaving medication and was deliberately indifferent to those needs.

126. On or about May 14, 2022, upon information and belief, DIRECTOR TESTAMARK knew that Craig Vanausdal needed emergency, ambulance, and/or urgent care to

an outside facility beyond St. Thomas Jail because the medical staff and/or equipment in the St. Thomas Jail was inadequate to reasonably care for Craig Vanausdal and was deliberately indifferent to those needs.

127. Upon information and belief, DIRECTOR TESTAMARK, at all material times, had actual or constructive knowledge during Craig Vanausdal's detention at the St. Thomas Jail, up until the time that he died, that it did not have the proper medication to provide to him at the facility and that it would not receive it timely.

128. On or about May 5, 2022 through May 16, 2022, DIRECTOR TESTAMARK was deliberately indifferent to Craig Vanausdal's serious medical needs by, *inter alia*, failing to diagnose, failing to render adequate treatment, failing to refer to a proper doctor, failing to order a follow-up assessment, failing to run diagnostic testing, failing to activate EMS, failing to activate 911, failing to request ambulatory services, failing to arrange specialty care, failing to transport to an urgent care, failing to transport to an emergency room, failing to transport to a hospital, failing to provide proper access to medication and/or failing to transport off island to a facility that could properly treat Craig Vanausdal.

129. As a direct and proximate result of the deliberate indifference noted above, Craig Vanausdal was denied his life-saving medication, was not transferred to an outside emergency facility, and was not transported off-island to provide him the care he needed, resulting in his death, and which caused damages his Estate and to his surviving mother pursuant to 5 V.I.C. §76, for which the Defendant is liable.

130. DIRECTOR TESTAMARK's deliberate indifference was a violation of Craig Vanausdal's clearly-established federal constitutional rights for which 42 U.S.C. § 1983 provides a remedy.

131. The PLAINTIFF requests a trial by jury on all issues so triable in this count.

132. PLAINTIFF is entitled to recover reasonable attorneys' fees for the successful prosecution of this claim pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff TOM CARIVEAU, as Personal Representative of the Estate of CRAIG VANAUSDAL, Deceased, seeks all damages legally recoverable, pursuant to 5 V.I.C. §76, by the Estate of Craig Vanausdal and by or on behalf of his surviving mother, Roseanna Lanciano, from the Defendants, jointly and severally, including awards of attorney's fees and punitive damages, if warranted under the facts and the law, as well as any other relief this Court deems just and proper,.

## JURY DEMAND

The Plaintiff demands a trial by jury of all issues triable as a right by a jury.

Dated this 16th day of June, 2025.

Respectfully submitted,

*/s/ John P. Fischer, Esq.*

John P. Fischer, Esq.
VI Bar No. 1232
Fischer Redavid, PLLC
15-B Norre Gade
P.O. Box 1197
Charlotte Amalie, St. Thomas
U.S. Virgin Islands 00804
Telephone: (340) 715-5297
Facsimile: (954) 860-8584
john@yourchampions.com
usviservice@yourchampions.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 16th day of June 2025, I electronically filed the foregoing document with the Clerk of Court using the EM/ECF system which will send a notification of such filing to all counsel of record registered on the CM/ECF system to the following, and I have sent the filling to all non-filer users via U.S. Mail, postage prepaid:

Kevin A. Rames, Esq.
V.I. Bar No. 193
KaSandra N. Rogiers, Esq.
V.I. Bar No. 2208
2111 Company Street, Suite 3
Christiansted, St. Croix
U.S. Virgin Islands 00820
Telephone: (340) 773-7284
Facsimile: (340) 773-7282
kevin.rames@rameslaw.com
kasandra.rogiers@rameslaw.com

Julie Beberman, Esq.,
Assistant Attorney General
Department of Justice
6151 Estate LaReine
Kingshill VI 00850
julie.beberman@doj.vi.gov

Tanya Maerz, Esq.
Sydney Miller, Esq.
*Admitted Pro Hac Vice*
Husch Blackwell LLP
8001 Forsyth Boulevard, Suite 1500
St. Louis, MO 63105
Tanya.Maerz@huschblackwell.com
Sydney.Miller@huschblackwell.com

/s/ John P. Fischer
John P. Fischer, Esq.